## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Jesse P. Goode**
**3210 Vista St., NE**
**Washington, DC 20018,**

    *Plaintiff,*

**v.**

**District of Columbia,**
c/o Karl Racine, Attorney General

**Eugene Adams**
**5020 Klingle Street NW, Washington, DC 20016**,

**Nadine Wilburn**
**1816 Catherine Fran Street, Accokeek, Maryland 20607**,

**Robert Hawkins**
**1754 U Street NW Apt 3, Washington, DC 20009**,

**Joseph Onek**
**3723 Ingomar Street NW, Washington, DC 20015**,

**Yvonne Williams**
**3315 Wisconsin Avenue, Apt 406, Washington, DC 20016**,

    *Defendant.*

**Civil Action No.:**_____

**JURY TRIAL DEMANDED**

## COMPLAINT FOR EQUITABLE AND
## MONETARY RELIEF AND DEMAND FOR JURY TRIAL

1.    Plaintiff Jesse P. Goode brings this action against Defendants the District of

Columbia, Eugene Adams, Nadine Wilburn, Robert Hawkins, Joseph Onek, and Yvonne

Williams (collectively "Defendants") under 42 U.S.C. § 1983, to redress the deprivation of

protected free association and property interests without due process, in violation of the First and Fifth Amendments to the United States Constitution.

2.      This action is brought by Goode, a former Administrative Law Judge (ALJ) in the District of Columbia Office of Administrative Hearings (OAH), because Defendants unlawfully ended Goode's career as an ALJ when they declared him unsuitable for reappointment without any just or true cause. Defendants took this action in retaliation for Goode's work to unionize his follow ALJs and his work to fight against corruption within OAH.

3.      Specifically, Goode has been deprived of his property right of continued public employment as an ALJ without a fair hearing or opportunity to be heard. Goode has thus been deprived of his procedural due process rights.

4.      Further, Goode's right to free and fair association under the Constitution has been violated by Defendants, as they removed Goode from his post as retaliation against his attempts to organize his fellow ALJs. Goode has thus been intentionally deprived of his substantive due process rights in a manner that would strike any reasonable person as unconscionable.

## **PARTIES**

5.      Plaintiff Jesse P. Goode is a citizen of the District of Columbia. He was appointed as an OAH ALJ on June 20, 2005 and served until September 29, 2017.

6.      Defendant District of Columbia is a governmental municipal corporation.

7.      Defendant Eugene Adams is the OAH Chief Administrative Law Judge (CALJ) and an *ex officio,* non-voting member of the Commission on Selection and Tenure of Administrative Law Judges (COST).

8.      Defendant Nadine Wilburn is the Attorney General's *ex officio,* non-voting COST member.

2

9.     Defendant Robert Hawkins is the Mayoral voting member. Through Mayor's Order 2017-072, he was appointed on March 24, 2017, for a term to end April 30, 2020. 64 DCR 3009 (March 24, 2017).

10.     Defendant Joseph Onek is the D.C. Council voting member. His term expired on April 30, 2017, leaving the Council seat vacant for five months until his reappointment on September 22, 2017, "for a term to end April 30, 2020." 64 D.C. Reg. 9328.

11.     Defendant Yvonne Williams, a sitting Superior Court Judge, has functioned as the COST Chair since December 13, 2013, when then-Chief Judge Lee Satterfield wrote a letter designating her to replace the Honorable Gregory Jackson after he resigned on October 25, 2013. If she was appointed at all, her term expired on April 30, 2015, pursuant to D.C Code § 2-1831.07(c).

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because it asserts claims that arise under the laws of the United States, specifically 42 U.S.C. § 1983.

13.     This Court also has jurisdiction over this suit pursuant to 28 U.S.C. § 1343(a)(1), as Plaintiff has been deprived of his rights secured by the Constitution of the United States.

14.     Venue lies in this District Court pursuant to 28 U.S.C. § 1391(b) because the illegal acts and omissions giving rise to Goode's claims occurred in the District of Columbia.

## FACTUAL ALLEGATIONS

**Procedural Due Process for Deprivation of a Property Interest**

15.     The United States Supreme Court has held that "some form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

3

16.     Additionally, "[t]he fundamental requirement of [procedural] due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Id*. The requirement for procedural due process "'is flexible and calls for such procedural protections as the particular situation demands.'" *Id*. at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

17.     A hearing "must be 'at a meaningful time and in a meaningful manner.'" *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). And a party whose property interest is at stake must receive reasonable and adequate notice of a hearing because, "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg*, 397 U.S. at 269. Further, a "decisionmaker's conclusion…must rest solely on the legal rules and evidence adduced at the hearing." *Id*. at 271. And "an impartial decision maker is essential." *Id*.

**Public Employment as a Property Right**

18.     Public employees generally have a property interest in public employment and continued public employment. *Roth*, 408 U.S. at 578; *Perry v. Sindermann*, 408 U.S. 593, 601-03 (1972); *Arnett v. Kennedy*, 416 U.S. 134, 151-52 (1974); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985).

19.     Accordingly, there must be "some kind of hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Loudermill*, 470 U.S. at 542. Generally, a public employee "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id*. at 546.

**District of Columbia Office of Administrative Hearings & Commission on Selection and Tenure of Administrative Law Judges**

20.     OAH is a central ALJ panel that adjudicates cases arising from more than 40 District of Columbia agencies, boards, and commissions.  The Council of the District of Columbia, through the OAH Establishment Act, D.C. Code § 2-1831 *et seq*, created OAH to replace a decentralized system of hearing officers who reviewed disputed decisions issued by fellow agency employees. Conflicts built into this "embedded hearing officer" system raised legitimate public concerns about fairness when agencies function as accusers, prosecutors, and judges.

21.     As envisioned by the Establishment Act, OAH allays these concerns by putting agencies and private litigants on equal footing before independent ALJs shielded from political cronyism that might diminish their neutrality at the expense of due process.

22.     Because it recognized judicial independence is central to impartial ALJ decision-making, the Council did not grant reappointment authority to the CALJ.  The Council granted "final authority, to appoint, reappoint, discipline, and remove [ALJs]" to a separate decisional body: the three voting members of the COST.  D.C. Code § 2-1831.06(b).

23.     By separating their decisional functions from the CALJ, the Council expected the voting members to check the CALJ by making their own independent, impartial, and lawful reappointment decisions "to ensure the recruitment and retention of a well-qualified, efficient, and effective corps of [ALJs] in the Office." D.C. Code § 2-1831.06(a). This codified separation of functions, if followed, preserves judicial independence by divesting the CALJ of power over the livelihoods of ALJ reappointment candidates.

24.     The composition of the COST voting members further protects ALJ independence from undue influence by government branches. The Establishment Act mandates that appointees from all three branches must be lawfully seated for the COST to exist: "The [COST] shall consist

5

of 3 voting members," one appointed by the Mayor, one by the Chair of the D.C. Council subject to Council confirmation, and one by the Chief Judge of the Superior Court of the District of Columbia. D.C. Code § 2-1831.07(a).

25.     The Establishment Act further protects judicial independence by classifying ALJs as "Statutory Officeholders," a subset of Excepted Service employees with tenured job protections rooted in their appointing statutes. D.C. Code § 1-609.08(15). This carves ALJs out of the general at-will status of Excepted Service employees under D.C. Code § 1-609.05.

26.     The Establishment Act further protects judicial independence by constraining the COST voting members' discretion to deny reappointments. For instance, 6-B DCMR 3705.21 requires the voting members to "reappoint the [ALJ] if [they] find[] that the [ALJ] has satisfactorily performed the responsibilities of [the] office and is likely to continue to do so." D.C. Code § 2-1831.09(a) lists the "responsibilities of [the] office." These objective standards, if applied impartially, protect ALJs from arbitrary terminations at the end of their terms.

27.     The Establishment Act further protects judicial independence by relegating the CALJ to one of two non-voting *ex officio* COST seats, the other being the Attorney General or his or her designee from the Senior Executive Attorney Service.  D.C. Code § 2-1831.07(a).

28.     The CALJ's non-voting role in the reappointment process is limited to providing the voting members with recommendations supporting or opposing particular ALJ candidates.[1]

---

[1]  The CALJ's limited reappointment role is intentional. In developing the Establishment Act, the Council rejected Bill 13-865 because it gave the CALJ too much power over ALJ personnel decisions. The Council instead enacted a marked-up Committee Print of Bill 14-208, which gave COST voting members authority over ALJ selection, discipline and reappointment decisions. This separation of functions became the Act's most important structural protection for judicial independence. The Council's intent on the subject is clear:

> [Bill 14-208] establishes a [COST], and was proposed by the Williams Administration in response to concerns raised by Councilmembers during the last

29.     In making final reappointment decisions, the COST voting members must afford "significant weight" to the CALJ recommendation to the extent it is "founded on substantial evidence."  D.C. Code § 2-1831.10; 6-B DCMR 3705.21.

30.     If the CALJ issues a negative recommendation, the affected ALJ is entitled to a fair hearing before the COST voting members.  6B DCMR 3705.19 (granting the ALJ a "right to appear and be heard at [a] meeting" before the COST).[2]

31.     Throughout the reappointment process, an ALJ has a protected property "interest in possible reappointment which entitle[s the ALJ] to a thorough and fair evaluation of [the ALJ's] reappointment candidacy by an impartial [COST], and [the ALJ is] entitled to such process as would ensure that the [COST's] evaluation of his candidacy is thorough and fair."  *Pearson v. District of Columbia*, 644 F.Supp.2d 23, 47 (D.D.C. 2009).

**Requirements for Lawful COST Appointments**

32.     COST voting members have staggered three-year terms ending on April 30. D.C Code §§ 2-1831.07(c) and (d). After terms expire, incumbents "shall be eligible for reappointment," D.C Code § 2-1831.07(c), meaning their seats remain vacant until they are reappointed or replaced by new appointees "to serve the unexpired portion of the [new] term[s]."

---

Council period. In Bill 14-208 as introduced, [ALJs] would have been appointed by the Chief ALJ, but Councilmembers expressed concern that this … gave the Chief too much power. In the Committee Print, the Commission is composed of representatives from … the three branches of government, and the Commission, *rather than the Chief Administrative Law Judge*, will be responsible for the selection, reappointment, and discipline of Administrative Law Judges.

Report from Kathy Patterson, Chairperson, Committee on the Judiciary re: Bill 14-208, the "Office of Administrative Hearings Establishment Act of 2001," at 9 (Sept. 25, 2001) (legislative history of Law 14-76) (emphasis added).

[2]  A codified right to be heard at a "meeting" is legally indistinguishable from being heard at a "hearing."

*Id.* And if an incumbent "leaves office before the [April 30th] expiration of his or her term, a new member may be appointed to serve out the remainder of the term." *Id.*

33. Because the COST "shall consist of 3 voting members" (D.C. Code § 2-1831.07(a)), the voting members all must be lawfully seated to conduct official business.

34. Except for Council-confirmed appointees, the District of Columbia Home Rule Act, D.C. Code § 1-204.22(2), vests the Mayor with final authority to appoint board and commission members. Filling the Mayoral COST seat thus requires a Mayor's Order.

35. The D.C. Council voting member is a Council-confirmed appointee. Filling this seat requires a Council Chair nomination, a Proposed Resolution, a hearing, vote, and publication of in the D.C. Register.

36. The D.C. Superior Court Chief Judge lacks authority to appoint local board and commission members. Filling the Superior Court COST seat thus requires two steps: The Chief Judge must designate an appointee pursuant to the Establishment Act, and a Mayor's Order must put the appointment into effect pursuant to the Home Rule Act.[3]

**Plaintiff's Professional Background**

37. On June 20, 2005, COST appointed Goode to a two-year term ending June 20, 2007, and it reappointed him to ten-year term ending June 20, 2017.

38. Goode served for ten years on the OAH Ethics Committee, and Defendant Adams appointed him to Chair the Ethics Committee on March 24, 2016.

---

[3] Although a Mayor's Order is required for such appointments, the Mayor herself has delegated the day-to-day coordination of board and commission appointments to the Office of Talent and Appointments (MOTA), headed by a MOTA Director. *See* Mayor's Orders 2015-063 and 064 (February 2, 2015). These delegated Home Rule Act functions were previously carried out by the Office of Boards and Commissions. *See* Mayor's Order 2001-189 (December 19, 2001).

39.    In October 2007, then-CALJ Tyrone Butler named Goode as Chair of the Pay Parity Committee, which collaborated with the D.C. City Council for a $20,000 ALJ pay raise.

40.    In 2010, then-CALJ Mary Oates Walker appointed Goode to the OAH Rules Committee, which accomplished two major overhauls of the OAH Rules, making them more user-friendly to *pro se* litigants, agency representatives, and attorneys.

41.    In 2014, Acting CALJ Wanda Tucker appointed Goode to oversee the OAH General Counsel Office, and Goode, working with fellow ALJs and staff, developed effective systems for managing attorney work and hired and assimilated new attorneys into a more stable, efficient, and productive work environment.

42.    In December of 2016, Defendant Adams appointed Goode as the Principal Administrative Law Judge (PALJ) for the OAH Employment Cluster, which hears benefits cases affecting vulnerable litigants, including Unemployment Insurance cases subject to federal Department of Labor (DOL) timeliness and quality audits. Under Goode's stewardship, OAH met all DOL audit requirements and integrated new public sector workers compensation and wage theft cases into the Employment Cluster's regular operations.

43.    Goode received no litigant complaints about any aspect of his job performance.

44.    Goode received no discipline or complaints from fellow ALJs and staff.

45.    Goode received the highest ratings on the ALJ evaluations OAH issued on November 15, 2006, November 17, 2007, January 11, 2010, December 30, 2011, and November 7, 2016. In the November 7, 2016 evaluation, Defendant Adams stressed, "I appreciate your thoroughness, professionalism, and your attention to your responsibilities to our litigants."

**Plaintiff's Efforts to Combat Corruption at OAH and to Organize the ALJ Union**

46.     On June 13, 2012, Goode joined fifteen ALJ signatories to a letter asking then-Council Member (now Council Chairman) Phil Mendelson and then-Mayor (now Council Member) Vincent Gray to investigate CALJ Walker for unethical behavior.

47.     In a joint letter to the COST on October 23, 2013, Council Chair Mendelson and Mayor Gray declared the ALJ signatories, including Goode, had furthered the "District's policy of encouraging the reporting of suspected wrongdoing, mismanagement, waste, fraud and abuse."

48.     The ALJ letter, combined with an ongoing investigation by the Board of Ethics and Government Accountability, led the BEGA to charge 19 ethics violations against Walker, who admitted to four violations carrying $20,000 in fines.

49.     Mayor Gray then fired CALJ Walker for cause.

50.     This controversy created a rift within OAH between those who signed the ALJ letter, including Goode, and those who disagreed with the actions taken against Walker.  Goode drew special ire because of his perceived leadership in Walker's ouster.

51.     Concurrently with the foregoing controversy, a labor controversy emerged on July 27, 2012, when the International Federation of Professional and Technical Engineers (IFPTE) petitioned the Public Employee Relations Board (PERB) to recognize the OAH ALJs as a local union bargaining unit.

52.     Goode led the unionization effort, which CALJ Walker and her supporters opposed through vigorous PERB litigation, and which Walker and her supporters lost. Goode's union leadership intensified the animus against him from Walker supporters.

53.     OAH workplace tensions again surfaced on September 25, 2014, when Acting

CALJ Wanda Tucker held a meeting about Walker's illegal personnel actions that required

corrective temporary pay cuts for some staff members.

54.     During the meeting, ALJ Ann Yahner, who had opposed both Walker's ouster and

the formation of an ALJ bargaining unit, became angry and physically confronted CALJ Tucker.

Seven eyewitnesses signed affidavits that ALJ Yahner was the aggressor.

55.     CALJ Tucker issued ALJ Yahner a nine-day suspension pursuant to 6B DCMR

3741.2, which Yahner appealed to the COST.

56.     On October 30, 2014, Defendant Williams overturned the suspension in a

decision issued without interviewing any witnesses or considering any eyewitness affidavits.

Yahner circulated the decision by email to all ALJs.

57.     Goode replied, stating to Yahner and the other ALJs that Defendant Williams's

decision did not vindicate Yahner, and that Yahner's "behavior, and the COST's validation of it,

is another example of the coarsening of American civil society."

58.     The COST reappointed ALJ Yahner with Defendant Adams's favorable

recommendation on June 21, 2016. OAH employees who opposed both the ALJ bargaining unit

and Walker's ouster were not treated adversely in any way.

**Plaintiff Submits Reappointment Request**

59.     However, Defendants began to treat Goode differently for his actions.

60.     On December 9, 2016, Defendant Adams announced by email ALJ Yahner's appointment as the new Principal Administrative Law judge (PALJ) for Information Systems and Technology. The creation of the new PALJ position required prior notice and consultation with the Federation of Administrative Law Judges (FALJ), pursuant to the Collective Bargaining Agreement (CBA).

61.     On December 13, 2016, Goode submitted a timely reappointment request. The request included a variety of documents that evidenced his good performance on the job, including his significant decisions, positive evaluations, efficient docket management, committee work, and many other contributions to agency operations and the community.

62.     Defendants never disputed any of these performance metrics, even as they sought to prevent Goode's reappointment.

63.     On December 14, 2016, as FALJ President, Goode advised Defendant Adams by email that his action of unilaterally creating the new PALJ position violated CBA Article 1, Sections 1 and 3.

64.     On December 15, 2016, Goode and other FALJ members met with Defendant Adams and OAH General Counsel Vanessa Natale to discuss the premature appointment of ALJ Yahner to the new PALJ position without issuing a position description and prior notice and opportunity for FALJ to comment on the new position pursuant to the CBA.

65.     On December 16, 2016, Defendant Adams announced by email that "I've been reminded – gently and professionally – that I did not comply with relevant terms of the [CBA] in creating the PALJ position for Information Systems and Technology."

12

**Plaintiff's Reappointment is Attacked both Anonymously and Overtly**

66.     In January 2017, written reminders about the upcoming public comment phase of Goode's reappointment were left on the office chairs of only those who resented Goode for his role in Walker's ouster and his union efforts.

67.     The Defendants and Natale encouraged these disaffected employees to submit anonymous letters opposing Goode's reappointment.

68.     On January 10, 2017, Defendant Adams emailed a draft PALJ description to Goode and other FALJ members, and Goode forwarded his concerns to FALJ members the same day.

69.     On January 6, 2017, COST published the official Notice soliciting public comments in regard to Goode's reappointment.  64 D.C. Reg. 1 (January 6, 2017).

70.     The COST received no negative comments from anybody who appeared as a litigant before Goode.

71.     The COST received 18 letters supporting Goode's reappointment. All these comments had signatures, and all these comments were based on direct observations of Goode's demeanor and performance dating as far back as ten years.

72.     The COST received one signed and five anonymous letters opposing Goode's reappointment by calling him, among other things, "a big bad union boss."

73.     The only signed letter that opposed Goode's reappointment came from ALJ McDonald, who disagreed with Goode's anti-corruption and pro-union actions. And McDonald admitted that Plaintiff's performance as an ALJ was without issue, but she nonetheless argued that Goode was also "evil," "divisive and mean-spirited."

74.     Defendant Adams falsely assured Goode that he would only recommend reappointments on objective job performance metrics.

75.     On or about March 22, 2017, OAH General Counsel Vanessa Natale walked unannounced into Goode's office to discuss his reappointment, which she said was "in peril" because of the anonymous letters.

76.     Natale said she had regular off-the-record conversations with Defendant Williams and that she could use these *ex parte* back channels to support his reappointment. Natale also said she could use her considerable sway with Defendant Adams to keep Goode's reappointment "out of peril."

77.     But Natale's apparent offer to keep his reappointment "out of peril" was subject to a *quid pro quo*. In consideration for his property right, his public employment, Natale required that Goode had to "back off" of FALJ's objection to the new PALJ position for ALJ Yahner.

78.     Natale said "That's what I need you to do . . .  back off." Natale then pressed that, if Goode wanted his job, "it was best" if FALJ "fell in line."

79.     As the FALJ President, Goode could not "fall in line" or "back off" of the union's interest in enforcing the CBA.

80.     On or about April 5, 2017, Natale sent an email to Goode in which she solicited FALJ's views on the new PALJ position. Goode did not relent in his position, but he instead followed the CBA and consulted with FALJ members. He then provided Defendant Adams and Natale detailed comments about the new PALJ position to spur further union and management discussions.

81.     On or about July 24, 2019, the District of Columbia Public Employees Relations Board (PERB) found Natale's threats "interfered with, restrained, and coerced" Goode in the exercise of protected union rights. D.C. Code §§ 1-617.01. 1-617.04, and 1-617.06 *et seq*

**Defendants' Legally Deficient Inquiry into Plaintiff's Reappointment**

82.     Because Goode requested reappointment on December 13, 2016, Defendant Adams had until April 12, 2017 (120 days), to make his "recommendation, with a statement of reasons, as to whether [Goode] should be reappointed."  6B DCMR 3705.5 and 3705.4(e).

83.     During the 120-day period, Defendant Adams falsely told Goode his reappointment was assured.

84.     Defendant Adams falsely told Goode and other ALJs that anonymous letters would not jeopardize reappointments, including Goode's.

85.     On the mandatory April 12, 2017 recommendation deadline, Defendant Adams issued a letter to COST stating that:

> [Goode] "has been professional, thorough, and helpful" in all his work and that "Judge Goode's work product and his timeliness in publishing orders over his last term have been exemplary. Further, by all accounts, he is professional, courteous and fair with the litigants and representatives who appear before him."

86.     In violation of COST reappointment regulations 6B DCMR 3705.5 and 3705.4(e), Defendant Adams further advised he was "postpon[ing] a formal recommendation" to complete an "ongoing inquiry" into matters (of which Judge Goode is fully aware)."[4]

87.     The reference to an "ongoing inquiry" was a falsehood. There was no "ongoing inquiry" into Goode's reappointment as of April 12, 2017.

---

[4]  There is no such thing as a "formal recommendation." Defendant Adams simply used this tactic to skirt the mandatory April 12 deadline for submitting his "recommendation" pursuant to 6B DCMR 3705.5 and 3705.4(e).

88.     Before Goode refused to "back off" from enforcing the CBA, Defendant Adams never invoked the anonymous letters (or anything else) to investigate Goode. After Goode refused to "back off," Defendant Adams invoked the letters to launch an investigation that supposedly started with witness interviews on or about May 3, 2017.

89.     Defendant Adams did not engage an experienced neutral investigator to conduct an impartial fact-based inquiry into Goode's reappointment.

90.     To the contrary, Defendant Adams conducted an in-house investigation that disregarded all favorable information about Goode. The investigator did not interview any witnesses favorable to Goode, as the investigator interviewed only witnesses with known grudges against Goode. The investigator also gave unquestioned credence to negative information from anonymous sources. Further, the investigator generated no impartial investigative report or other records (*e.g.*, transcripts, recordings, *etc.*) that could be tested for credibility.

91.     Defendant Adams controlled the investigation by relegating it to OAH Attorney Advisor Shawn Nolen, an at-will subordinate who Defendant Adams could fire for refusing to go along with his plan.

92.     Nolen interviewed three witnesses with known grudges against Goode: (1) ALJ Calonette McDonald, who claimed Goode was "evil," (2) ALJ Yahner, and (3) Louis Neal, who had work performance disputes with Goode in 2014, and who Defendant Adams could fire for any refusal to disparage Goode regardless of the truth.

93.     In addition to the named biased witnesses, Nolen claimed to have interviewed eleven anonymous staff members between May 3 and June 5, 2017.

94.     All the anonymous interviewees, assuming they exist, would have worked under Natale's and Adams's authority. Thus, these anonymous interviewees could have been pressured to make statements to keep their jobs.

95.     The investigation purportedly ended on June 5, 2017, with Nolen's purported interview with his supervisor, Neal.

96.     Two days later, on June 7, 2017, Defendant Adams notified Goode by email that he opposed his reappointment.

**Defendant Adams's Negative Reappointment Recommendation**

97.     On June 20, 2017, Defendant Adams issued his formal negative reappointment recommendation, which is a patchwork of foundationless anonymous assertions and *ad hominem* attacks that brands Goode as "elitist, racist, vicious, and arrogant."

98.     The recommendation then scapegoats Goode for agency rifts (real and imagined) that date as far back as ten years. Defendant Adams had no direct knowledge of most of the events described in his letter which, if they happened at all, occurred before he came to OAH.

99.     Defendant Adams's charges of racism against Goode were baseless. Likewise, Adams made a baseless and bizarre claim that Goode urged OAH to adopt a "hairstyle policy," Adams also criticized Goode for firing OAH staff, despite his knowledge that only the CALJ may fire staff.

100.    Most egregious of all, Defendant Adams's June 20, 2017 letter punished Goode for his protected disclosures by referencing his whistleblowing against CALJ Walker as grounds for denying his reappointment.

101.    The letter also had a direct and predictable retaliatory effect on FALJ, as it frightened ALJs into quitting the union.

102.    Defendant Adams never challenged Goode's performance as an ALJ.  Nor did he proffer an argument that Goode failed to satisfy the requirements of his office or that he was otherwise unsuitable for reappointment under the Establishment Act.

103.    Adams, between his *ad hominem* attacks on Goode, focused on (1) Goode's criticism of ALJ Yahner's behavior at the September 2014 ALJ meeting and (2) Goode's criticism of Defendant Williams for overturning Yahner's suspension.

104.    Defendant Adams, despite the lack of direct knowledge of these three-year-old events, expressed support for Williams's exoneration of ALJ Yahner and branded Goode's criticisms as disparaging to the COST.

105.    Because Defendant Adams invoked Goode's criticism of Defendant Williams to oppose his reappointment, Williams became a fact witness in Goode's case. Williams nonetheless presided over the reappointment of Goode as the COST Chair even though she was not a COST member and had also become a witness.

106.    On June 21, 2017, Goode received Defendant Adams's negative reappointment recommendation through personal service.

107.    On June 27, 2017, Defendant Williams served Goode a Notice of "possible grounds for denial of reappointment" based solely on the negative recommendation with no analysis.

108.    The Notice violated COST regulation 6B DCMR 3705.15, which permits the issuance of "possible grounds for denial of reappointment" only after it affords the affected ALJ notice and opportunity to supplement the record and appear before the COST (which Goode requested on or about April 24, 2017) and only after the COST meets to consider and then votes to issue "possible grounds for denial of reappointment."

18

109.    Defendants ignored Goode's timely request to appear before the COST, and they also failed to meet or vote on anything, in violation of 6B DCMR 3705.10 and 3705.11.

110.    Defendant Williams's premature Notice set an accelerated final reappointment hearing for July 15, 2017, which left no preparation time. This action violated Goode's codified rights (1) to submit a notice of intent to supplement the record within 10 days after service of Adams's letter pursuant to 6B DCMR 3705.10, (2) to thereafter receive 20 days to supplement the record pursuant to 6B DCMR 3705.13, and (3) to appear in person before the COST votes on whether to issue "grounds for possible denial of reappointment" pursuant to 6B DCMR 3705.15.

111.    Defendant Williams issued the unlawful hearing Notice without a COST meeting or vote, in violation of both 6B DCMR 3705.15, 6B DCMR 3721.6 and the Open Meetings Act (OMA).

112.    By letter to Defendant Adams on June 26, 2017, Goode, through counsel, asked Adams to recuse himself from COST voting-member deliberations and to provide "all documents you reviewed or received" during his investigation.

113.    By letter to Goode's counsel on June 27, 2017, Defendant Adams declined to recuse himself and said Goode was "not entitled to . . . discovery or . . . due process."

114.    By letter to Defendant Williams on June 28, 2017, Goode, through counsel, noted the unlawful hearing Notice and asked Williams to follow the COST's own reappointment regulations.

115.    Defendant Williams refused to follow the COST reappointment regulations, and by letter dated June 30, 2017, she set Goode's final hearing for July 19, 2017.

116.    By letter on June 28, 2017, Goode, through counsel, notified the COST that Defendant Adams refused to recuse himself from voting-member deliberations and refused to

disclose the record he reviewed for his recommendation. Goode explained that, as the chief prosecutor and author of the negative reappointment recommendation, Defendant Adams could not deliberate about whether to accept his own recommendation.  Goode further argued there was no legitimate reason to keep him from reviewing the complete reappointment record.

117.    COST ignored the letter. Defendant Adams later deliberated with the other Defendants about whether to adopt his own negative recommendation.

**Defendant's Legally Deficient Hearings Regarding Plaintiff's Reappointment**

118.    On June 29, 2017, the COST convened a "public" meeting in violation of OMA notice requirements.  Goode attended even though his reappointment was not on the agenda.

119.    Also, in violation of the OMA, Defendant Williams closed the public meeting by announcing the COST was going into "executive" session, without voting to close the meeting to the public and without citing an OMA provision authorizing a closed session.

120.    At the time, Defendant Hawkins was the only properly seated COST voting member at the illegal closed meeting.  Defendant Williams presided as the COST Chair, even though she was not a COST member because her term had expired on April 30, 2015, assuming she had a valid appointment at all. Defendant Onek participated despite his own acknowledgment that his term had expired on April 30, 2017, and despite his own warning that his presence could taint the entire proceeding. The other participants were Defendants Wilburn and Adams, Natale, and Neal.

121.    The meeting occurred outside of Goode's presence, without his knowledge, and it occurred before he had a chance to oppose Defendant Adams's negative recommendation.

122.    The *ultra vires* meeting participants decided to terminate Goode in secret.

123.    The following non-exhaustive list of discussion topics took place at the meeting:

a.      Defendant Williams stated on the record that she had collected biased

prejudicial evidence against Goode by taking *ex parte* calls from ALJ acquaintances

opposed to his reappointment. Defendant Williams volunteered the following *verbatim*

account of her *ex parte* contacts:

> [I]t seems like from my review of the documentation as well as just
> independent calls that people have called me. Like, well, it wasn't
> anonymous. I did speak with one or two ALJs who called me, because I
> know them personally. And, you know, their indication was that
> notwithstanding sort of whatever good that Judge Goode brings to the
> office, there's a level of toxicity that comes with him that just makes for an
> unpleasant working environment.

b.      Defendant Onek counseled against factoring evidence into the foregone

termination.  He advised that, regardless of Goode's evidence, "we could simply say that

we find no substantial evidence to counter ... countervail [Adams'] recommendation."

c.      Defendant Hawkins, the only COST voting member with legal authority to

vote, deferred to Natale's coaching as to whether he should "engage in a full-throated

discussion" with Goode about his reappointment. If he did, Natale told him to "refer to

what we say in the letter," meaning Defendant Adams's negative recommendation.

Natale suggested acceptable discussion topics could "perhaps" include Goode's yet-to-

be-filed opposition.

d.      Natale, Defendant Adams's second-chair prosecutor and chief e*x parte*

witness, told the group that "I consider and have gotten a legal opinion that [Goode's

behavior creates] a hostile work environment. So that's, you know, an unfortunate thing."

She said Goode "does his orders and whatnot, but there's other things" Defendant Adams

cannot accept. The "legal opinion" and "other things" had never been disclosed to Goode

because they did not exist.

e.      Despite the reappointment standards in the Establishment Act and COST regulations, Defendant Williams proclaimed "there really is no standard [for reappointment]. It's just we review the documents and then we can make the decision."

124.    The secret *ultra vires* group thus reached its final termination decision on June 29, 2017, based on *ex parte* information from a sitting D.C. Superior Court judge, no evidence, no standards, and a non-existent legal opinion, without hearing from Goode.

125.    Defendant Williams deemed the result a "hard decision," making little effort to conceal that Goode was "not going to have employment" because of the press coverage of his honest protected activities:

> You know it's always unfortunate when you feel like someone's not going to have employment, but I think that our goal at the COST is to try to make OAH, you know, a superstar agency. It's gone through several years of sort of being dragged through the press and dragged through the mud and, you know, and unfortunately, I think Judge Goode was, he has been part of that … it certainly infects the agency. . . sometimes we gotta make that hard decision.

126.    Concurrently with their secret June 29, 2017 termination decision, the Defendants, along with Natale and Neal, decided to hold public hearings to create the impression Goode had been denied reappointment after receiving a chance to be heard.

**The First Reappointment Hearing**

127.    The first of these hearings occurred on July 19, 2017. To protect Adams's recommendation from collapsing under scrutiny, the Defendants prohibited Goode from cross-examining anyone, including Adams, who would sit in judgment of his own recommendation with COST member Hawkins and lapsed members Williams and Onek.  They further prohibited Goode from calling witnesses.

128.    By letter to the COST on July 10, 2017, Goode, through counsel, attached examples of improper *ex parte* communications from Natale and Neal to the Defendants in another ALJ reappointment, and asked for assurances that no *ex parte* contacts occurred in his own case, Goode further requested the disclosure of any *ex parte* contacts that already occurred.

129.    The Defendants refused to provide assurances that no *ex parte* contacts occurred. Such *ex parte* contacts (including over 150 separate emails) had, in fact, occurred.

130.    By letter on July 17, 2017, Council Chair Phil Mendelson urged the Defendants to postpose ALJ reappointments because Defendant Onek's term had expired on April 30, 2017.

131.    On July 19, 2017, the Defendants held the hearing anyway, during which Defendant Onek volunteered from the dais that, because his term had expired, he was "in a somewhat awkward position, but I am here, and I have decided to ask a question, and - - whatever."

132.    Defendants knew or should have known that Defendant Williams was not a COST member because her term expired on April 30, 2015, pursuant to the Establishment Act, D.C Code § 2-1831.07(d), and/or because she had never been appointed through a Mayor's Order.

133.    Despite knowing she and Defendant Onek were not valid COST members, Defendant Williams convened the July 19, 2017 hearing at 11:00 a.m. and directed Goode, his counsel, and the public to leave the room while the Defendants met secretly in violation of the OMA and Sunshine Act.

134.    After the COST returned to public session, Defendant Williams wasted no hearing time before she blamed Goode for the *Philadelphia Enquire*r's press coverage of Natale's threats to "back off" on union issues to keep Goode's reappointment "out of peril," something Defendant Williams learned about through *ex parte* communications with Natale.

135.    The press coverage had no relevance to Goode's suitability for reappointment. In fact, none of the issues discussed by Defendants bore any relevance to the one statutory requirement guaranteeing reappointment, which is performance.

136.    Defendant Williams then blamed Goode for Chairman Mendelson's intervention to stop ALJ reappointments while Defendant Onek's seat was vacant. In doing so, Williams effectively blamed Goode either for Onek's expired term or for Chairman Mendelson's concerns about *ultra vires* reappointment proceedings.  Neither issue bore any relevance to Goode's performance.

137.    Even though she and Onek were not COST members, Defendant Williams held the July 19, 2017 hearing, where Defendant Adams sat in judgment of his own negative recommendation, all while the COST did not permit Goode to call witnesses or cross-examine anybody.

138.    Defendant Hawkins, the COST's only voting member, paid little to no attention during the hearing, and he took phone calls in another room. Goode, thus, fought for his job before Defendants Williams and Onek, who were present but not lawfully seated, as well as Defendant Hawkins, who was lawfully seated but not present.

139.    Aside from Goode, only Defendant Williams had direct knowledge about anything in Defendant Adams's negative recommendation, namely her October 2014 decision to overturn the Yahner suspension and Goode's criticism of that decision.  Defendant Williams questioned Goode extensively on that subject. This issue also bore no relevance to Goode's performance.

140.    To the extent that the COST permitted Goode or his counsel to speak, they both presented unrebutted sworn testimony and argument that Goode was a competent ALJ, that he

24

satisfied applicable Establishment Act and COST reappointment criteria, and that Defendant Adams's negative recommendation was unsupported by substantial evidence and, in many instances, contradicted by his own exhibits.

141.    After Defendant Williams adjourned the public hearing, she remained with the other Defendants for another closed meeting in violation of the OMA.

142.    After the July 21, 2017 hearing, in addition to Defendant Adams, the COST allowed OAH prosecutors Nolen, Neal, and Natale to engage in its deliberations.

**The July 21st Non-Reappointment Letter and The Canceled Non-Reappointment Meeting Set for July 28, 2017**

143.    No later than July 21, 2017, Defendant Williams signed a two-page letter in which she announced Goode's non-reappointment.

144.    The letter did not deem Goode unsuitable for reappointment, and it disregarded the COST's mandate to reappoint ALJs who have "satisfactorily performed the responsibilities of [the] office and are likely to continue to do so in the future."  6B DCMR 3705.21.

145.    The letter went only so far as to conclude that "some" unspecified "conduct" . . . "calls [Goode's] suitability for reappointment into serious question, as we have decided here."

146.    Whatever the undisclosed reason(s) for the decision may have been, Defendant Williams's July 21, 2017 letter states the COST reached its final decision "having reviewed the entire record . . . at the July 19, 2017, COST meeting."

147.    Taking Defendant Williams at her word, it would be necessarily true that Goode's fate was sealed no later than July 21, 2017, when Defendant Hawkins was the COST's only voting member with a valid appointment.

148.    The COST initially planned to announce its negative reappointment decision at a public meeting noticed for 3:30 p.m., Friday, July 28, 2017.

149.     Judge Williams canceled the meeting because the Defendants could come up with no plausible justification for their voting on COST business with only one voting member.

150.     On August 1, 2017, Defendant Williams obtained a letter from Superior Court Chief Judge Robert Morin which purported to appoint her, *nunc pro tunc*, from December 16, 2016, through December 16, 2019.

151.     Chief Judge Morin's arbitrary term violated the Establishment Act's mandatory three-year staggered terms that end on April 30 of given years pursuant to D.C Code § 2-1831.07(d).  Further, there is no authority in the Establishment Act or elsewhere for the retroactive *nunc pro tunc* portion of the unlawful term.

152.     Regardless of content, Chief Judge Morin's August 1, 2017 letter, by itself, did not seat Defendant Williams on the COST, and no Mayor's Order ever appointed her pursuant to the Home Rule Act.  Defendant Williams, thus, was not a COST member before or after the August 1, 2017 letter, and her actions connected to Goode's reappointment were and remained *ultra vires*.

153.     Acting under the guise that the COST had enough voting members with valid appointments, the Defendants convened a second public hearing at 11:00 a.m. on September 29, 2017.[5]

154.     Like the previous hearing, Defendant Adams sat in judgment of his own preordained negative recommendation, Defendant Williams presided as the COST Chair even though she was not a COST member, and Defendant Hawkins worked on his mobile device and left without voting on Goode's reappointment.

---

[5]  By then, Defendant Onek had been reappointed to the COST by a Council Resolution, "for a term to end April 30, 2020."  64 D.C Reg. 9328 (Sept. 22, 2017).  Defendant Williams was still not a COST member.

155.    Council Chairman Phil Mendelson appeared and advocated forcefully in favor of Goode's reappointment and against the politicization of ALJ reappointments based on protected whistleblowing and union activities.

156.    Defendant Williams concluded the hearing by thanking Chairman Mendelson for his views, which she assured would be considered in Goode's final reappointment decision. Defendant Williams's assurances were false. The decision had been made months earlier.

157.    After the September 29, 2017 public hearing, in violation of the OMA, the Defendants went into an illegal closed session. After the closed session and with no roll-call vote in violation of the OMA, Defendant Williams announced the final decision not to reappoint Goode at 1:00 p.m. that day.

158.    At 1:05 p.m. that day, Goode received by email a two-page "non-reappointment decision" signed by Defendant Williams. Neal forwarded the document to Goode, which Neal had received by email earlier that morning at 9:30 a.m., which was approximately 90 minutes before the hearing began.

159.    The September 29, 2017 letter was a post-dated version of the non-reappointment letter Defendant Williams had already signed on July 21, 2017, as confirmed by the July 21, 2017 date in signature page header. The letter said it was based on the evidence adduced at the July 21, 2019, hearing but made no mention of the September 29, 2017, hearing.

160.    Effective September 29, 2017, Goode's ALJ career ended without any specified reasons, with no evidence, no standards, no chance to be heard, and multiple due process violations.

**COUNT I**
**Deprivation of Procedural Due Process Under the Fifth Amendment**
**42 U.S.C. § 1983**
**As to All Defendants**

161.	Goode adopts and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

162.	In order to state a claim for relief under Section 1983, a plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1998).

163.	In order to meet the "color of state law" requirement, a plaintiff must show that the defendant "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 49.

164.	Goode had a property right in his continued public employment and reappointment as an OAH ALJ, as long as his performance remained satisfactory, which it had been at the time of his non-reappointment.

165.	Specifically, the regulations state, in part, "The Commission **shall** reappoint the Administrative Law Judge if it finds that the Administrative Law Judge has satisfactorily performed the responsibilities of his or her office and is likely to continue to do so." D.C. Mun. Regs. Personnel §6-b3705.21 (emphasis added).

166.	The COST reappoints most ALJs, and reappointment is considered the norm, except in a few cases. These regulations provide for reemployment absent sufficient cause. Goode therefore had a property interest in his continued reemployment as an OAH ALJ and in the possibility of reappointment, as the role of OAH ALJ has a *de facto* "tenure." *Perry*, 408 U.S. at 599-601. Defendants deprived Goode of this property right without sufficient due process.

28

167.     For the reasons stated above, including but not limited to the lack of quorum during the COST hearings, the *ex parte* communications, *ultra vires* actions taken by individuals who were COST members in name only, illegally closed sessions, the inability to call or cross exam witnesses, and clear evidence of decisions made about Goode before he had any opportunity to rebut the allegations made against him, the COST reappointment process was in clear violation of District of Columbia law.

168.     Even after Goode was able to speak at all in his own defense, he received little chance to be heard. Goode could not cross-examine witnesses. In fact, no one could cross examine them, as most of the adverse witnesses remained anonymous. Goode likewise could not call witnesses.

169.     There was not an unbiased review panel or tribunal, as Adams's letter effectively served as a prosecutorial statement, while he also participated in the COST's deliberations.

170.     All members of the COST acted under the color of D.C. law, as they exercised their official powers as granted by D.C. Even though at least two of the voting members were no longer valid members, they nonetheless acted upon power granted by D.C. law and acted under the appearance of being cloaked in the authority of the District of Columbia.

171.     The District of Columbia has a custom or policy that allowed for these procedural due process violations to occur. COST regularly violates the notice requirements and open meeting requirements of the D.C. Open Meetings Act, far exceeding the scope of Goode's reappointment process. Serious concerns have been raised by others aside from Goode about the validity of the appointments of both Williams and Onek. Moreover, the policies came about due to the deliberate actions of defendant members of the COST.

172.    The individual defendants, Adams, Wilburn, Hawkins, Onek, and Williams, have

no valid defense of absolute immunity.

173.    The individual defendants likewise have no valid defense of qualified immunity.

The individual defendants had cause to know or should have had cause to know that the

numerous flaws in the process, including an improperly seated tribunal, improper *ex parte*

contacts, the bias of the tribunal, and the lack of ability to effectively counter those who made

accusations, were all violations of Goode's clearly established due process rights.

174.    As a result of the individual Defendants' actions under color of the law of the

District Columbia and the District of Columbia's custom and practices, Goode has suffered and

will continue to suffer damages.

**COUNT II**
**Unlawful Retaliation in Violation of the First Amendment Right to Free Association**
**42 U.S.C. § 1983**
**As to All Defendants**

175.    Goode adopts and incorporates by reference the allegations of the preceding

paragraphs as if fully set forth herein.

176.    There is a "freedom of association" under the First Amendment for "a right to

associate for the purpose of engaging in those activities protected by the First Amendment—

speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v.*

*U.S. Jaycees*, 468 U.S. 609, 618 (1984).

177.    The right of free association includes the right to associate freely with unions.

*Thomas v. Collins*, 323 U.S. 516, 534 (1945); *Smith v. Arkansas State Highway Emp., Local*

*1315*, 441 U.S. 463, 464-66 (1979).

178.    Further, "[i]n order to prevail on a First Amendment retaliation claim, a

government employee must demonstrate that his or her protected activity was a substantial or

motivating factor in prompting the retaliatory act." *Ramey v. U.S. Marshals Serv.*, 755 F. Supp. 2d 88, 94 (D.D.C. 2010) (citing *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007)).

179.    Goode engaged in protected activity under the First Amendment by being a member of the union and by his taking action in support of union interests.

180.    Adams referenced actions Goode took as a union president to justify his recommendation to not reappoint him. Further, Natale, OAH's General Counsel, made comments about Goode's union membership and tied his reappointment to his ability to cause the union to take actions that she wanted.

181.    All members of the COST acted under the color of D.C. law, as they exercised their official powers as granted by D.C. Even though at least two of the voting members were not valid members, they nonetheless acted upon power granted by D.C. law and acted under the appearance of being cloaked in the authority of the District of Columbia.

182.    The District of Columbia has a custom or policy that allowed for the anti-union bias to permeate decisions made about Goode's tenure based on his affiliation with the union. First, the District of Columbia itself found that the prior Chief ALJ had anti-union bias and had retaliated for actions involving whistleblowing about Walker, which related to Goode's union affiliation. The policies came about due to the deliberate actions of members of the COST. D.C.'s own Council Chairman cautioned that he believed there were improper motives that drove the decision to not reappoint Goode.

183.    Many of the claims in Adams's letter have their basis in Goode's union activities, including activities in which Goode engaged as part of his duties as union chapter president. Defendants would not and could not have come to the same decision not to reappoint without Goode's union activities having played such a large role in Adams's justifications.

184.    The individual defendants, Adams, Wilburn, Hawkins, Onek, and Williams, cannot claim absolute immunity.

185.    As to qualified immunity, the COST members had cause to know or should have had cause to know that the accusations made against Goode had a basis in anti-union bias. The right to be free from punishment for participation in union activities by a government employer is clearly established under Supreme Court precedent.

186.    As a result of the individual Defendants' actions under color of the law of the District Columbia and the District of Columbia's custom and practices, Goode has suffered and will continue to suffer damages.

**PRAYER FOR RELIEF**

Based on the foregoing, Goode respectfully requests that he be awarded the following relief from Defendants:

a.    Equitable relief requiring the Defendants (or their successors) to reinstate Goode to his former ALJ position;

b.    Economic damages for lost compensation and damages to Goode's career;

c.    Compensatory damages, including but not limited to pain and suffering, emotional distress and reputational damage;

d.    Reasonable costs and experts' and attorneys' fees;

e.    Pre and post judgment interest as provided by law; and

f.    Any other such relief that the Court may deem just and equitable.

## **DEMAND FOR JURY TRIAL**

Goode requests a trial by jury for any and all issues proper to be so tried.

Respectfully Submitted,


/s/Andrew Dylan Howell_____
R. Scott Oswald (D.C. Bar # 458859)
Andrew D. Howell (D.C. Bar # 155355)
The Employment Law Group, P.C.
888 17th Street, N.W., 9th floor
Washington, D.C. 20006
(202) 261-2838
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
dhowell@employmentlawgroup.com
*Counsel for Plaintiff*