## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JESSE GOODE,<br><br>        Plaintiff,<br><br>    v.<br><br>DISTRICT OF COLUMBIA, *et al*.,<br><br>        Defendants. | No. 20-cv-1332-RJL |

### DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Defendants District of Columbia, Judge Yvonne Williams, Eugene Adams, Nadine Wilburn, Robert Hawkins, and Joseph Onek respectfully submit this motion to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A memorandum of points and authorities in support of this motion and a proposed order are attached for the Court's consideration.

Date:   August 3, 2020

Respectfully Submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Christina Okereke*
CHRISTINA OKEREKE [219272]
Chief, Civil Litigation Division Section II

/s/David A. Jackson
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW

Suite 630 South
Washington, D.C. 20001
(202) 724-6618 (Direct Line)
(202) 436-2598 (Cell Phone)
(202) 741-8999 (Fax)
davida.jackson@dc.gov

*/s/ Steven N. Rubenstein*
STEVEN N. RUBENSTEIN [#1013094]
Assistant Attorney General
441 Fourth Street, N.W.
Suite 630 South
Washington, D.C. 20001
(202) 727-9624
(202) 741-0592 (fax)
Steven.Rubenstein3@dc.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| JESSE GOODE, |
| Plaintiff, |
| v. |
| DISTRICT OF COLUMBIA, *et al*., |
| Defendants. |

No. 20-cv-1332-RJL

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS**

**INTRODUCTION**

Denied reappointment after serving a ten-year term as an Administrative Law Judge

(ALJ), Plaintiff brings two claims under 42 U.S.C. § 1983 against the District of Columbia (the

District) and the members of its Commission on Selection and Tenure of Administrative Law

Judges (the COST).[1] *See* Am. Compl. [22].  First, alleging myriad procedural shortcomings,

Plaintiff claims that he was deprived of his "property right" of "continued public employment as

an ALJ" without due process, in violation of the Fifth Amendment of the Constitution. *Id.* ¶ 1.

Second, Plaintiff claims that Defendants retaliated against him by not reappointing him,

purportedly due to his union activities, in violation of his constitutional rights under the First

Amendment.  *Id.*

The Amended Complaint should be dismissed.  Plaintiff fails to state a plausible

procedural due process claim under § 1983 because he had no property interest in his

---

[1]     The individually named defendants are Judge Yvonne Williams, Eugene Adams, Nadine
Wilburn, Robert Hawkins, and Joseph Onek (collectively, with the District, "Defendants").

reappointment following the expiration of his statutorily defined term of office.  And in any

event, he was afforded notice of the grounds for non-reappointment and an opportunity to be

heard and therefore received all the process he was due.  Plaintiff also fails to state a plausible

First Amendment retaliation claim because he does not allege that he spoke as a citizen on

matters of public concern or any facts giving rise to an inference that his union-related speech

activities, his efforts to organize a union, or his union membership were substantial or motivating

factors in his non-reappointment.

On both claims, Plaintiff also fails to allege any basis for the District's municipal

liability.  Finally, Plaintiff's claims against the individual defendants in their personal capacities

are barred by their qualified immunity, or alternatively, their absolute immunity for conduct

closely related to the judicial process.  The Court should therefore grant Defendants' motion and

dismiss the Amended Complaint with prejudice.

## FACTS

## I.    The ALJ Appointment Process and Plaintiff's Initial Appointment as an ALJ

The Council of the District of Columbia (D.C. Council or Council) created the Office of

Administrative Hearings (OAH), a central ALJ panel that adjudicates cases arising from more

than 40 District agencies, boards, and commissions, by enacting the OAH Establishment Act .

Am. Compl. ¶ 20 (citing D.C. Code § 2-1831 *et seq.*).  The Council granted "final authority, to

appoint, reappoint, discipline, and remove [ALJs]" to the COST.  *Id.* ¶ 22 (citing D.C. Code § 2-

1831.06(b)).  The COST consists of three voting members:  one appointed by the Mayor, one

appointed by the Chair of the D.C. Council subject to Council confirmation, and one appointed

by the Chief Judge of the Superior Court of the District of Columbia.  *Id.* ¶ 24 (citing D.C. Code

§ 2-1831.07(a)).  The COST also has two non-voting *ex officio* members:  the Chief

Administrative Law Judge (CALJ) of OAH and the District's Attorney General or his or her designee.  *Id.* ¶ 27 (citing D.C. Code § 2-1831.07(a)).

The initial term of office for an ALJ appointed before December 6, 2005, is two years, after which the ALJ is eligible for reappointment to a term of ten years.  *See* D.C. Code § 2-1831.08.  After serving a reappointment term of ten years, an ALJ is eligible for reappointment to a new term of six years.  *Id.*  No earlier than nine months before the expiration of an ALJ's term, an ALJ seeking reappointment must file a statement with the COST and the CALJ requesting reappointment.  D.C. Mun. Regs. tit. 6-B, § 3705.1.  Within 120 days of such a request, the CALJ is required to prepare a record for the COST's review, including a "recommendation, with a statement of reasons, as to whether [the ALJ] should be reappointed." *Id.* §§ 3705.4(e); 3705.5.  In making final reappointment decisions, the COST's voting members must afford "significant weight" to the CALJ's recommendation if it is "founded on substantial evidence."  Am. Compl. ¶ 29 (citing D.C. Code § 2-1831.10; D.C. Mun. Regs. tit. 6-B, § 3705.21).  If the CALJ issues a negative recommendation, the affected ALJ, upon request, has the right to "appear and be heard at [a] meeting" before the COST.  *Id.* ¶ 30 (citing D.C. Mun. Regs. tit. 6-B, § 3705.19).

Plaintiff was first appointed as an ALJ in 2005 for a two-year term.  *Id*. ¶ 5.  He was then reappointed to a ten-year term, ending June 20, 2017.  *Id*. ¶ 37.

## II.    Plaintiff's Alleged Protected Activities

On June 13, 2012, Plaintiff and fifteen other ALJs sent a letter to then-Councilmember Phil Mendelson and then-Mayor Vincent Gray asking them to investigate former CALJ Mary Oates Walker for unethical behavior and other actions impeding the ALJs' ability to do their jobs.  *Id*. ¶ 46; Ex. 1, June 13, 2012 Letter.  Mayor Gray later fired Walker for cause.  Am.

Compl. ¶ 49.  This allegedly created a rift within OAH between those who signed the letter and those who disagreed with the actions taken against Walker.  *Id.* ¶ 50.

On July 27, 2012, the International Federation of Professional and Technical Engineers petitioned the Public Employee Relations Board (PERB) to recognize the OAH ALJs as a local union bargaining unit.  *Id.* ¶ 51.  Plaintiff allegedly led the unionization effort, which he maintains Walker and her supporters vigorously opposed.  *Id.* ¶ 52.

According to Plaintiff, "workplace tensions" arose two years later at a September 25, 2014 meeting when then-acting CALJ Wanda Tucker brought up the subject of temporary pay cuts.  *Id.* ¶ 53.  At the meeting, ALJ Ann Yahner and Tucker engaged in a heated verbal altercation.  *Id.* ¶ 54; Ex. 2, June 20, 2017 Letter at 14.  The next morning, Plaintiff sent Yahner an email insisting that Yahner publicly apologize for the incident.  Ex. 2 at 15.  Tucker then imposed a nine-day suspension on Yahner, which Yahner appealed.  Am. Compl. ¶ 55.  After Yahner was suspended, Plaintiff emailed Yahner again and suggested that she seek mental health counseling.  Ex. 2 at 16.

Yahner appealed her suspension to the COST, and Defendant Judge Yvonne Williams, a sitting D.C. Superior Court Judge and the COST's Chair, issued an order overturning the suspension.  Am. Compl. ¶ 56.  Yahner circulated the decision by email to all ALJs.  *Id.*  Plaintiff quickly responded by email, copying all of OAH's ALJs, and wrote, "Never confuse a conclusion of not guilty with one of innocence . . . the record establishes that you acted inappropriately, and I think, deserved to be disciplined . . . I don't think you can escape responsibility for your actions that easily."  *Id.* ¶ 57; Ex. 2 at 18.  Plaintiff then contributed to a "Motion to Reconsider" asking the COST to reimpose Yahner's suspension, which the COST rejected.  Ex. 2 at 19.

Defendant Eugene Adams later became CALJ.  Am. Compl. ¶ 7.  In December 2016, Adams appointed Plaintiff as the Principal Administrative Law judge (PALJ) for the OAH Employment Cluster.  *Id.* ¶ 42.  Also, on December 9, 2016, Adams announced by email he was appointing Yahner as the new PALJ for Information Systems and Technology.  *Id.* ¶ 60.  The creation of a new PALJ position required prior notice and consultation with the ALJ union, the Federation of Administrative Law Judges (FALJ), under the Collective Bargaining Agreement (CBA).  *Id.* ¶ 60.  On December 14, 2016, Plaintiff, as FALJ President, advised Adams that his action of unilaterally creating the new PALJ position violated the CBA.  *Id.* ¶ 63.  The next day, Plaintiff and other FALJ members met with Adams and OAH General Counsel Vanessa Natale to discuss the new PALJ position and the CBA's requirements.  *Id.* ¶ 64.  At this meeting, Adams apologized for his oversight and pledged to correct it.  Ex. 3, July 17, 2019 PERB Decision & Order.  The following day, Adams wrote to all OAH personnel stating that he did not comply with the CBA in his unilateral creation of the position, that he rescinded his decision until further notice, and that FALJ would be permitted to make suggested changes to his proposal for the new position.  *Id.*; Am. Compl. ¶ 65.  On January 10, 2017, Adams emailed a draft PALJ description to Plaintiff.  *Id.* ¶ 68.

III.     **The <u>COST's Decision to Not Reappoint Plaintiff</u>**

On December 13, 2016, Plaintiff submitted his reappointment request.  *Id.* ¶ 61.  On January 6, 2017, the COST published official notice soliciting public comments for his requested reappointment in the D.C. Register.  *Id.* ¶ 69. (citing 64 D.C. Reg. 54 (January 6, 2017)).  The COST received 18 letters supporting Plaintiff's reappointment and one signed and five anonymous letters opposing it.  *Id.* ¶¶ 71-72.

On or about March 22, 2017, Natale entered Plaintiff's office to discuss his reappointment, which she allegedly said was "in peril" because of the anonymous letters. *Id.* ¶ 75. Plaintiff maintains that Natale offered to advocate for his reappointment to Adams and Judge Williams if Plaintiff would "back off" of FALJ's objection to the new PALJ position for Yahner. *Id.* ¶¶ 76-78. Neither Plaintiff nor Natale ever discussed this alleged conversation with Adams. Ex. 3 at 3-5. On or about April 5, 2017, Natale sent an email to Plaintiff seeking FALJ's views on the new PALJ position. Am. Compl. ¶ 80. Plaintiff responded with detailed comments about the new PALJ position to spur further union and management discussions. *Id.*

On April 12, 2017, Adams transmitted a record to the COST that included copies of Plaintiff's last full performance evaluation and a provisional evaluation from November 7, 2016, a list of one year of decisions authored by Plaintiff, and copies of six other decisions that Adams deemed relevant to the determination of Plaintiff's fitness for reappointment, in compliance with D.C. Mun. Regs. tit. 6-B, § 3705.4. Ex. 4, Apr. 12, 2017 Letter; Am. Compl. ¶ 85. Adams further advised that he was "postpon[ing] a formal recommendation" to complete an "ongoing inquiry" into "matters (of which Judge Goode is fully aware)." Am. Compl. ¶ 86.

Based on the letters in opposition to Plaintiff's reappointment, Adams began an investigation on or about May 3, 2017. *Id.* ¶ 88. Before beginning the investigation, Adams met with Plaintiff on April 12, 2017, to discuss how it would be conducted and who would conduct it. Ex. 3 at 4. Adams informed Plaintiff that Shawn Nolen, an attorney in OAH's Office of General Counsel, would conduct the investigation and Plaintiff did not object. *Id.*; Am. Compl. ¶ 91. Nolen interviewed ALJ Calonette McDonald, who had written a letter in opposition to Plaintiff's reappointment; Yahner; Louis Neal, the deputy general counsel of OAH; five OAH paralegals; and six employees in OAH's Clerk's Office. *Id.* ¶¶ 92-93; Ex. 2 at 4-5. The

investigation concluded on June 5, 2017.  Am. Compl. ¶ 95.  On June 7, 2017, Adams notified

Plaintiff that he opposed his reappointment.  *Id.* ¶ 96.

On June 20, 2017, Adams issued a 38-page letter (with 44 supporting exhibits) notifying

the COST that he would not support Plaintiff's reappointment.  *Id.* ¶ 97; Ex. 2.  Nowhere in this

38-page letter are Plaintiff's participation in organizing the ALJ's union, his participation in

union activities as a member of FALJ, and the discussions about the PALJ for Information

Systems and Technology mentioned.  *See* Ex. 2.  Plaintiff received Adams's letter on June 21,

2017.  Am. Compl. ¶ 106.

Adams's letter documents Plaintiff's "conduct/behavior that cumulatively has not been

helpful to the continued improvement of the agency," including the following incidents:

- Plaintiff's emails to Yahner, and continued pursuit of her discipline, in relation to the 2014 incident between her and Tucker;
- Plaintiff's treatment of then-Attorney-Advisor Neal, who considered Plaintiff's conduct towards him as his supervisor "hostile, harassing and/or discriminatory";
- Plaintiff's "abrasive" treatment of paralegals in the office;
- Plaintiff called another ALJ a "little f**ker" in front of a recently hired staff member;
- Plaintiff disparaged Yahner repeatedly in front of multiple OAH employees, including accusing her of "racially motivated conduct";
- Plaintiff "'[u]ncontrollably' yelled at and disparaged an employee for making a typographical error";
- Plaintiff, in his written supplemental request for reappointment, criticized the work performance of ALJ MacDonald, who had opposed his reappointment; and
- Plaintiff "talks down to subordinate staff members and those that do not have college degrees, and [] has advocated for terminating less-educated employees and replacing them with college graduates."

Ex. 2 at 15-24, 27-28.

Adams considered various sources for guidance on reappointment decisions, including

the District's Commission on Judicial Disabilities and Tenure, which looks at off-the-bench

conduct in assessing "judicial temperament."  *Id.* at 30-38.  Adams concluded that "factors

beyond just the quality and timeliness of a judge's work" were relevant for reappointment

purposes, and as such, he "evaluate[d] other considerations which included, *inter alia*, appropriate interactions with litigants, lawyers, court staff, court officials and others with whom a judge deals in an official capacity" and recommended that COST not reappoint Plaintiff.  *Id.* at 31; Am. Compl. ¶ 97.

By letter to Adams dated June 26, 2017, Plaintiff, through counsel, asked Adams to recuse himself from the COST's voting member deliberations and to provide "all documents you reviewed or received" during his investigation.  Am. Compl. ¶ 112.  By letter to Plaintiff's counsel on June 27, 2017, Adams declined to recuse himself.  *Id.* ¶ 113.

The same day, Judge Williams served Plaintiff a notice of "possible grounds for denial of reappointment" based on Adams's recommendation.  *Id.* ¶ 107.  The notice identifies the information the COST had considered as of that date, including the following documents submitted by Plaintiff:  Plaintiff's December 13, 2016 reappointment request; Plaintiff's April 18, 2017 response letter to Adams; Plaintiff's April 24, 2017 request to supplement the record; and Plaintiff's May 15, 2017 supplementation to the record.  Ex. 5, June 27, 2017 Notice.  The COST had also considered Adams's record and recommendation.  *Id.*  The notice stated that COST was considering denying Plaintiff's reappointment based on Adams's recommendation letter and attached exhibits, the letters in opposition to Plaintiff's reappointment, and the reappointment record as a whole, and advised Plaintiff that he had until July 12, 2017, to file a written response and/or request to appear before the COST.  *Id.*

By letter to Judge Williams dated June 28, 2017, Plaintiff's counsel argued that the meeting notice was deficient and asked Judge Williams to follow the COST's reappointment regulations.  Am. Compl. ¶ 114.  Judge Williams, by letter dated June 30, 2017, set Plaintiff's meeting for July 19, 2017.  *Id.* ¶ 115; Ex. 6, June 30, 2017 Letter.  A public notice of the July 19,

2017 meeting was published in the D.C. Register on June 30, 2017.  Ex. 7, Public Notice; 64 D.C. Reg. 6149 (June 30, 2017).

On June 29, 2017, the COST convened a public meeting that Plaintiff attended.  Am. Compl. ¶ 118.  Judge Williams then closed the public meeting by announcing the COST was going into "executive" session.  *Id.* ¶ 119.  Also present were Adams; Defendant Robert Hawkins, the Mayoral voting member; Joseph Onek, the D.C. Council voting member;[2] Nadine Wilburn, the *ex officio* designee of the D.C. Attorney General; Natale; and Neal.  *Id.* ¶¶ 8-10, 120.  Plaintiff alleges that during the "executive session," the "meeting participants decided to terminate [him] in secret," Judge Williams discussed *ex parte* contacts from "one or two" ALJs who were personal acquaintances and shared their opinions of Plaintiff causing an "unpleasant working environment," and Natale said to the group "I consider and have gotten a legal opinion that [Plaintiff's] behavior creates a hostile work environment."  *Id.* ¶¶ 122-24.

The COST convened Plaintiff's meeting on July 19, 2017.  *Id.* ¶ 127.  Plaintiff attended with counsel.  Am. Compl. ¶ 140.  Plaintiff presented sworn testimony and his counsel argued that Plaintiff was a competent ALJ, that he satisfied applicable Establishment Act and COST reappointment criteria, and that Adams's negative recommendation was unsupported by substantial evidence.  *Id.*  The COST commissioners, including Judge Williams, asked Plaintiff questions and he was allowed to answer them.  *Id.* ¶ 139.  Plaintiff was not afforded the opportunity to confront and cross-examine witnesses.  *Id.* ¶ 137.

In a letter dated July 17, 2017, Council Chairman Phil Mendelson asked the COST to postpone ALJ reappointments because he believed Onek's term had expired on April 30, 2017.

---

[2]     Plaintiff contends that Onek's term expired on April 30, 2017, leaving the Council seat "vacant" for five months until his reappointment on September 22, 2017, "for a term to end April 30, 2020." Am. Compl. ¶ 10 (citing 64 D.C. Reg. 9328).

*Id.* ¶ 130.  The COST initially planned to announce its reappointment decision at a public

meeting noticed for July 28, 2017, but cancelled the meeting.  *Id.* ¶¶ 148-49.  On August 1, 2017,

D.C. Superior Court Chief Judge Robert Morin issued a letter reappointing Judge Williams to the

COST, *nunc pro tunc* from December 16, 2016, through December 16, 2019.  *Id.*  ¶ 150.

Defendants convened a second meeting on September 29, 2017.  *Id.*  By then, Onek had

been reappointed to the COST by a Council Resolution "for a term to end April 30, 2020."  *Id.* ¶

153 n.5.  Council Chairman Mendelson appeared at the meeting and advocated in favor of

Plaintiff's reappointment.  *Id.* ¶ 155.  The COST went into a closed session, after which Judge

Williams announced the COST's final decision not to reappoint Plaintiff.  *Id.* ¶ 157.  That day,

Neal emailed Plaintiff a "non-reappointment decision" signed by Judge Williams.  *Id.* ¶ 158.

According to Plaintiff, the September 29, 2017 letter was a "post-dated version" of a non-

reappointment letter Judge Williams had allegedly already signed on July 21, 2017, which he

contends is "confirmed" by the July 21, 2017 date in the signature page's header.  *Id.* ¶¶ 143-46,

159.  The September 29, 2017 letter notes that the COST considered the record, including

Plaintiff's supplemental submissions, that the COST found Adams's recommendation to be

supported by substantial evidence, and that it accepted his recommendation against

reappointment of Plaintiff.  Ex. 8, Sept. 29, 2017 Letter.  The letter further notes that the COST

determined that Plaintiff "on multiple occasions and in varied circumstances, acted

inappropriately, unfairly, and possibly illegally in [his] interactions with [his] colleagues and

other staff in the office," and also stated that "[t]his unacceptable conduct has cause[d] sufficient

fear, tension and a feeling of intimidation in OAH as to adversely impact morale and

performance."  *Id.* at 1.

FALJ later filed a complaint with PERB challenging Plaintiff's non-reappointment, alleging unfair labor practices.  Ex. 3.  On or about July 24, 2019, PERB upheld a hearing examiner's finding that Natale's alleged comments to Plaintiff "interfered with, restrained, and coerced" Plaintiff in the exercise of protected union rights.  *Id.* at 6-7.  But PERB also upheld the hearing examiner's finding that the Union failed to meet its burden of establishing a *prima facie* case that anti-union animus was a substantial or motivating factor in Adams's decision not to recommend Plaintiff's reappointment.  *Id.* at 7.  Both Plaintiff and Natale testified that neither of them had discussed the alleged conversation with Adams.  *Id.* at 3.

## STANDARD OF REVIEW

Dismissal under Rule 12(b)(6) is appropriate when a party has failed to set forth "a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While allegations in the complaint must be taken as true, a plaintiff must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555; *see also Jackson v. District of Columbia*, 826 F. Supp. 2d 109, 120 (D.D.C. 2011).  Courts need not accept as true "naked assertions devoid of further factual enhancement."  *Iqbal*, 556 U.S. at 679.  This also means that the court is not bound to adopt "inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint."  *Kowal v. MCI Comms. Corp., Inc.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Once a pleading is stripped of allegations not entitled to the presumption of truth, the court can analyze the remaining factual allegations to determine if they state a "plausible" claim for relief.  *Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 570; *JSC Transmashholding v. Miller*,

70 F. Supp. 3d 516, 520 (D.D.C. 2014).  "But raising a 'sheer possibility that a defendant has acted unlawfully' fails to satisfy the facial plausibility requirement."  *JSC Transmashholding*, 70 F. Supp. 3d at 520 (quoting *Iqbal*, 556 U.S. at 678).   A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged.  *Id.* at 520-21.

On a motion to dismiss, courts may consider documents attached as exhibits or incorporated by reference in the complaint or documents upon which the plaintiff's complaint necessarily relies even if produced by the defendant.  *Patrick v. District of Columbia*, 126 F. Supp. 3d 132, 135-36 (D.D.C. 2015).  Moreover, in deciding a motion to dismiss, a court may take judicial notice of public records from other proceedings.  *Abhe & Svoboda, Inc.*, 508 F.3d at 1059 (citing *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005)).

Here, the Court may consider the exhibits attached without converting Defendants' motion to dismiss to one for summary judgment because the documents are incorporated by reference in the Amended Complaint.  *See Abhe & Svoboda*, 508 F.3d at 1059.  The Court may also take judicial notice because the exhibits are documents publicly filed in related litigation. *See Lewis v. DEA*, 777 F. Supp. 2d 151, 159 (D.D.C. 2011) (citing *Covad Commc'ns Co.*, 407 F.3d at 1222 ("The court may take judicial notice of public records from other court proceedings.").  The COST record, including Adams's letter recommending that Plaintiff not be reappointed, is publicly filed in *Jesse Goode v. D.C. Comm'n on Tenure and Selection of Admin. Law Judges,* 2017 CA 007291 P(MPA).  Finally, as to Exhibit 1—Plaintiff's June 13, 2012 letter asking for investigation into former CALJ Walker—because of media reports and wide dissemination of the letter, *see, e.g.*, http://www.washingtonpost.com/blogs/mike-debonis/post/dc-administrative-judges-sharply-criticize-their-

boss/2012/06/14/gJQAXpKncV_blog.html, the Court may take judicial notice of it. *See Youkelsone v. F.D.I.C.*, 910 F. Supp. 2d 213, 221 (D.D.C. 2012) (a court may take judicial notice of historical or political facts that are verifiable with certainty), *aff'd*, 560 F. App'x 4 (D.C. Cir. 2014).

# ARGUMENT

## I.   Plaintiff Fails to State a Procedural Due Process Claim.

The Fifth Amendment prohibits government officials from depriving any person of liberty or property without "due process of law." *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009); *see also Butera v. District of Columbia*, 235 F.3d 637, 645 n.7 (D.C. Cir. 1987) (applying Due Process Clause of the Fifth Amendment to the District). "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)). Without a valid, protected interest, there can be no procedural due process violation. *See Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 59 ("Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process.") (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). If a plaintiff can show the deprivation of a cognizable liberty or property interest, a court then considers "whether the procedures used by the Government in effecting the deprivation comport with due process." *Id.* The Due Process Clause does not protect any particular outcome; instead, it merely ensures that the procedures that led to such outcome are fair. *See Bishop v. Wood*, 426 U.S. 341, 350 (1976) ("The Due Process Clause . . . is not a guarantee against incorrect or ill-advised . . . decisions.").

Here, Plaintiff fails to state a procedural due process claim because he had no protected property interest in his reappointment,[3] and, in any event, he received all the process he was due. As a result, the Court should dismiss Count I of the Amended Complaint.

### A.    Plaintiff Had No Protected Property Interest in His Reappointment.

Plaintiff had no property interest in his reappointment as an ALJ. "It is well understood that, under the Fifth Amendment Due Process clause, '[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it." *Roth v. King*, 449 F.3d 1272, 1284 (D.C. Cir. 2006) (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)). Instead, a person must have "a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* Yet it is "federal constitutional law [that] determines whether [a claimed property] interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Castle Rock*, 545 U.S. at 757 (alteration, citations, and quotation marks omitted).

According to Plaintiff, he has been deprived of his "property right of continued public employment as an ALJ," Am. Compl. ¶ 3, but District of Columbia law creates no such property interest. Instead, it provides that "[a]n Administrative Law Judge shall be appointed to the

---

[3]      Plaintiff does not claim that he was deprived of any liberty interest in his employment. *See, e.g.*, *Brown v. McHugh*, 972 F. Supp. 2d 58, 66 (D.D.C. 2013). Moreover, Plaintiff fleetingly references the deprivation of his "substantive due process rights in a manner that would strike any reasonable person as unconscionable," Am. Compl. ¶ 4, but asserts no substantive due process claim in the counts of the Amended Complaint. *See id.* ¶¶ 161-186. Nor could he, as nothing he alleges constitutes behavior of governmental officers that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Feirson v. District of Columbia*, 506 F.3d 1063, 1066 (D.C. Cir. 2007) (citation omitted).

14

Excepted Service as a statutory officeholder pursuant to § 1-609.08," D.C. Code § 2-1831.08(b),

and that such officeholders' "terms of office shall be at the pleasure of the appointing authority,

or as provided by a statute for a term of years, subject for removal for cause as may be provided

in their appointing statute."  D.C. Code § 1-609.08.  Beyond that, "[e]mployees in the Excepted

Service . . . do not have any job tenure or protection."  D.C. Code § 1-609.05; *see also Hall v.*

*Ford*, 856 F.2d 255, 265-66 (D.C. Cir. 1988) (athletic director in excepted service position had

no protected property interest in job).  Plaintiff, therefore, had no property interest in his

reappointment beyond the expiration of his ten-year term.  *See Pearson v. District of Columbia*,

644 F. Supp. 2d 23, 47 (D.D.C. 2009) (in case brought by former OAH ALJ denied

reappointment suing the District for denial of due process, holding that "plaintiff did not have a

property interest which entitled him to the full panoply of due process"), *aff'd*, 377 F. App'x 34

(D.C. Cir. 2010); *Bason v. Judicial Council of D.C. Circuit*, 86 B.R. 744, 749 (D.D.C. 1988)

(non-reappointed bankruptcy judge had no legitimate claim to reappointment and, thus no

property interest protected by the Due Process Clause); *Mulhall v. District of Columbia*, 747 F.

Supp. 15, 23 (D.D.C. 1990) (attorney whose term lapsed had no property interest in continued

employment and defendants' decision not to extend his employment did not violate his due

process rights), *aff'd*, 946 F.2d 1565 (D.C. Cir. 1991); *Pinkney v. District of Columbia*, 439 F.

Supp. 519, 532 (D.D.C. 1977) (dismissing plaintiff's procedural due process claim where

plaintiff enjoyed no expectancy of keeping position beyond expiration of appointment and

therefore lacked the requisite property interest to trigger due process scrutiny).

      Plaintiff's contention that *Pearson v. District of Columbia*, 644 F. Supp. 2d 23 (D.D.C.

2009), holds to the contrary is wrong.  *See* Am. Compl. ¶ 31.  Plaintiff engages in sleight-of-

hand by relying on *Pearson* for the proposition that he had a property interest in possible

reappointment.  *See id.*  The court explicitly found that "[c]ontrary to plaintiff's argument . . .

plaintiff did not have a property interest which entitled him to the full panoply of due process."

*Pearson*, 644 F. Supp. 2d at 47 (citing *Halleck v. Berliner*, 427 F. Supp. 1225, 1235 (D.D.C.

1977)); *see also id.* at 49 (assuming without deciding that plaintiff had a property or liberty

interest for the purpose of deciding his substantive due process claim).  Rather, the court found

that the plaintiff, a non-reappointed OAH ALJ, only "ha[d] an interest in possible reappointment

which entitled him to a thorough and fair evaluation of his candidacy by an impartial

Commission."  *Id.* at 47.  The court did not engage in any extensive analysis to arrive at this

conclusion, instead adopting this language from *Halleck v. Berliner*, 427 F. Supp. 1225 (D.D.C.

1977), a 1977 district court opinion involving a challenge by a Superior Court judge to his non-

reappointment to the bench.  *See id.* (citing *Halleck*); *see also Halleck*, 427 F. Supp. at 1235-36.

And the court in *Halleck* was construing only a part of the Home Rule Act addressing

reappointments by the District's Commission on Judicial Disabilities and Tenure, not

reappointments under the OAH Establishment Act or the COST regulations.  *See Halleck*, 427 F.

Supp. at 1235-36.  Thus, neither *Pearson* nor *Halleck* provide a rationale for this Court to

conclude that ALJs have a property interest in reappointment by COST that would implicate the

Due Process Clause.

    While he attempts to equate his non-reappointment with removal or discipline, *see, e.g.*,

Am. Compl. ¶ 19 (arguing there must be "some kind of hearing prior to the discharge of an

employee who has a constitutionally protected property interest in his employment"); *id. ¶* 26

(arguing that D.C. law protects ALJs from "arbitrary terminations at the end of their terms"),

Plaintiff was not disciplined or removed during his term or at the end of his term.  The law is

clear:  "Non-reappointment of an [ALJ] shall *not* be deemed to be discipline or removal of the

[ALJ]."  D.C. Code § 2-1831.10(d) (emphasis added).  After his appointment to the Excepted

Service for a defined term, Plaintiff did "not have any job tenure or protection" once his term

expired.  D.C. Code §§ 1-609.05, 1-609.08.  Accordingly, he did not have a property interest in

future reappointment.  *See Roth*, 545 U.S. at 578 (holding that no property interest arose from a

contract for a limited term of employment that expired and was not renewed).

   Moreover, Plaintiff did not have any property interest in a new term because District of

Columbia law did not constrain the COST's discretion to deny his reappointment.  It is well

settled that "[w]hen a statute leaves a benefit to the discretion of a government official, no

protected property interest can arise."  *King,* 449 F.3d at 1285 (quoting *Bloch v. Powell*, 348 F.3d

1060, 1069 (D.C. Cir. 2003) (alteration omitted); *see also Castle Rock*, 545 U.S. at 756 ("[A]

benefit is not a protected entitlement if government officials may grant or deny it in their

discretion."); *cf. NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41-42 (D.C. Cir. 2015)

(there is a legitimate claim of entitlement if a statute or implementing regulations place

substantive limitations on official discretion to withhold award of the benefit upon satisfaction of

the eligibility criteria).  Such is the case here.  District of Columbia law offers only general

criteria to guide the COST in its reappointment of ALJs.  Indeed, one such criteria is that the

candidate "possess judicial temperament, expertise, experience, and analytical and other skills

necessary and desirable for an [ALJ]."  D.C. Code § 2-1831.08; *see also id.* § 2-1831.10(b)

(requiring consideration of "the efficiency, efficacy and quality of performance" of the ALJ

seeking reappointment).  Such vague and qualitative criteria cannot be characterized as

substantive limitations on official discretion.  *See Bloch*, 348 F.3d at 1069 ("To create a

protected property interest, regulations must limit discretion by explicitly mandatory language

*i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow.").

Plaintiff argues that District of Columbia law and regulations cabin the COST's discretion to reappoint by requiring reappointment if it finds that the ALJ has "satisfactorily performed the responsibilities of his or her office and is likely to continue to do so." *See* Am. Compl. ¶ 26 (citing D.C. Mun. Regs. tit. 6-B, § 3705.21 and D.C. Code § 2-1831.09(a), listing the "responsibilities of [the] office"). But injecting these official responsibilities into D.C. Mun. Regs. tit. 6-B, § 3705.21 still does not place *substantive* limitations on the COST's discretion, as these responsibilities are also general and subjective. *Id.*; *see* D.C. Code § 2-1831.09(a)(3) (an ALJ shall "[e]ngage in no conduct inconsistent with the duties, responsibilities, and ethical obligations of an [ALJ]; (7) ("Conform to all legally applicable standards of conduct."); (10) ("Cooperate with the Chief Operating Officer of the Office to achieve efficient and effective administration of the Office")). Accordingly, District of Columbia law does not create an entitlement to reappointment as an ALJ giving rise to a protected property interest.

Plaintiff's claim that he had *de facto* tenure, relying on *Perry v. Sindermann*, 408 U.S. 593 (1972), is also unavailing. Am. Compl. ¶ 166 (citing *Perry*, 408 U.S. at 600). There, a college professor whose contract was not renewed brought a procedural due process claim and sought reinstatement. *Perry*, 408 U.S. at 596. The Court held that, in the absence of a formal contractual tenure provision, a *de facto* tenure program shown through "existence of rules and understandings, promulgated and fostered by state officials," may support a "legitimate claim of entitlement to continued employment" and a procedural due process claim. *Id.* at 599-603. But the plaintiff there alleged that the state had promulgated guidelines providing that a person who had been employed as a teacher with the state for seven years or more had some form of job

tenure, and that his employer's "official Faculty Guide" said the administration wanted "its faculty members feel that he has permanent tenure . . . ." *Id.* at 599-600.  By contrast, Plaintiff merely claims that "the COST reappoints *most* ALJs, and reappointment is considered the norm, except in a few cases."  Am. Compl. ¶ 166 (emphasis added).  But this alleges "nothing more than expectation, not entitlements," *King*, 449 F.3d at 1285 (internal quotation marks omitted), and in fact cuts against his claim that reappointment is a forgone conclusion.  And Plaintiff's effort to hinge his *de facto* "tenure" on the COST's regulations is inapt.  *See* Am. Compl. ¶ 165-66 (arguing that the COST's "regulations provide for reemployment absent sufficient cause").  The expiration of an ALJ's term, not continued employment, is the default under the law.  D.C. Code § 2-1831.10(a).  An ALJ can, however, opt-in for reappointment, as if reapplying to the job, subject to the affirmative vote of a majority of the COST's voting members.  *Id.*  And again, District of Columbia law only imposes a cause requirement and the attendant procedural protections for the removal of an ALJ during his or her term of office, not for a reappointment decision.  D.C. Code § 2-1831.10(d).

Because Plaintiff had no property interest in reappointment to a new term as an ALJ, the Court should dismiss Plaintiff's procedural due process claim.

**B.      Even If Plaintiff Had a Protected Property Interest, He Received Constitutionally Adequate Process.**

Even if Plaintiff had a property interest in his reappointment, or some other generalized "protected interest," he was afforded adequate process.  "Once it is determined that due process applies, the question remains what process is due."  *FDIC v. Mallen*, 486 U.S. 230, 240 (1988).  The requirement for procedural due process "'is flexible and calls for such procedural protections as the particular situation demands.'"  *Mathews*, 424 U.S. at 334.  As a general rule, "individuals must receive notice and an opportunity to be heard before the Government deprives

them of property." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 49 (1993); *see also Atherton*, 567 F.3d at 690; *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trustees of Univ. of D.C.*, 56 F.3d 1469, 1472 (D.C. Cir. 1995).

Under the COST's regulations, the CALJ must provide an ALJ seeking reappointment with a copy of the record the CALJ prepares for COST's consideration.  D.C. Mun. Regs. tit. 6-B, § 3705.6.  The COST, in turn, must provide the ALJ with "redact[ed]" "copies of any comments it received" in response to its notice soliciting views from the public.  *Id.* § 3705.9. And the regulations preclude the COST from denying "reappointment unless the Commission first serves upon him . . . notice of grounds for possible denial" that "specify the reasons why the Commission is considering the possible denial."  *Id.* § 3705.17.

Plaintiff does not claim that Adams failed to serve him with a copy of the record required by D.C. Mun. Regs. tit. 6-B § 3705.4 and provided to the COST.  Likewise, he does not assert that the COST failed to provide him with redacted copies of the written comments received in response to its request for the public input.  And he does not contend that the COST failed to provide him notice of the grounds for a possible reappointment denial, only that it contained what he alone considered insufficient "analysis" beyond reference to Adams's negative recommendation.  Am. Compl. ¶ 107.[4]  Accordingly, Plaintiff fails to allege any facts showing that he did not receive adequate notice.

---

[4]      Plaintiff also complains that this notice was deficient because the COST issued it before he had the opportunity to supplement the record, in violation of D.C. Mun. Regs. tit. 6-B, § 3705.15.  Am. Compl. ¶ 108.  This argument is baseless.  First, Plaintiff had *already* provided a notice to supplement the record, and had supplemented the record, before the COST issued the notice letter.  Ex. 5.  And in any event, this regulation does not require that the COST provide an ALJ with an opportunity to appear before it *before* issuing a notice of grounds of non-appointment, only that it may not do so unless also affording an opportunity to be heard.  D.C. Mun. Regs. tit. 6-B, § 3705.15.

An ALJ seeking reappointment who timely files a request to appear before the COST may "appear and be heard at the meeting" where the COST takes final action on the request for reappointment.  D.C. Mun. Regs. tit. 6-B § 3705.19.  Plaintiff received exactly that.  Indeed, he admits he had the opportunity to present sworn testimony and argument and answer all questions posed by the COST.  *See* Am. Compl. ¶¶ 139-40.  Yet, unsatisfied, he demands more.  But he was not entitled to more.  *See Pearson*, 644 F. Supp. 2d at 47 (finding that the COST's reappointment process—affording plaintiff with multiple opportunities to submit evidence, respond to the COST's inquiries and concerns, present argument supporting his reappointment, and meet with the COST regarding his reappointment—was constitutionally sufficient), *aff'd*, 377 F. App'x 34 (D.C. Cir. 2010) (affirming dismissal of procedural due process claim because plaintiff was "afforded adequate process").  Plaintiff's disagreement with the outcome here is of no moment; he had ample opportunity to affirmatively present his case after being notified of the possible grounds for non-reappointment.  Due process requires no more.  *See Lightfoot v. District of Columbia*, 448 F.3d 392, 401 (D.C. Cir. 2006) (per curiam) (Silberman, J., concurring) ("[T]he Supreme Court's due process jurisprudence carefully distinguishes process from substance.  The issue is always . . . whether or not the claimant has had a fair opportunity—sometimes rather informal—to present his case and not whether the agency's substantive decision was reasonable.").  Plaintiff's Fifth Amendment claim should therefore be dismissed.

### C.   <u>Plaintiff's Specific Complaints About His Reappointment Process Are Meritless and Do Not Amount to a Plausible Constitutional Claim, Individually or Cumulatively.</u>

Alleging that "the COST reappointment process was in clear violation of District of Columbia law," Plaintiff complains that Defendants deprived him of his property right without due process.  Am. Compl. ¶ 167.  Specifically, Plaintiff alleges that (1) Defendants did not allow

21

him to call or cross-examine witnesses; (2) some of the COST's commissioners took *ultra vires* actions because they were not validly appointed and the COST therefore lacked a quorum; (3) the COST illegally closed sessions; (4) the COST's members engaged in *ex parte* communications; and (5) the tribunal was biased and Defendants made a decision before Plaintiff had an opportunity to rebut the allegations made against him.  Each of these objections is without merit and is addressed in turn.

### 1.     Plaintiff Had No Right to Compel or Cross-Examine Witnesses.

Plaintiff had no right to compel or cross-examine witnesses and due process did not require it.  According to Plaintiff, "a codified right to be heard at a 'meeting' is legally indistinguishable from being heard at a 'hearing,'" and therefore he was not afforded the process one would expect in a contested hearing.  *See* Am. Compl. ¶¶ 30 n.2, 137.  This argument overlooks D.C. law and the COST's regulations, which, in fact, distinguish the two.  *See* D.C. Code § 2-1831.10(d) ("Non-reappointment of an [ALJ] shall not be deemed to be discipline or removal of the [ALJ]."); D.C. Mun. Regs. tit. 6-B § 3735.8 (providing that only removals, not non-reappointments, will "be conducted in accordance with the procedures for contested hearings under" D.C. Code § 2-509).  Proceedings involving "[t]he selection or tenure of an officer or employee of the District" are thus expressly excluded from the definition of a "contested case."  *See Hines v. D.C. Comm'n on Selection & Tenure of Admin. Law Judges*, 183 A.3d 1283, 1284 (D.C. 2018) (citing D.C. Code § 2-502(8)(B)).  For this reason, the meeting Plaintiff was entitled to—and received—does not afford him a right to a trial-type contested hearing; it is not an adversarial proceeding or a fact-finding hearing.  *Id.*

Nor was it a criminal proceeding implicating Plaintiff's Sixth Amendment right to confrontation.  *See* Am. Compl. ¶¶ 116, 123, 142, 169 (characterizing Adams and other OAH

staff as "prosecutors"); *Pearson*, 644 F. Supp. 2d at 47; *Halleck*, 427 F. Supp. at 1236 (holding

that a candidate for judicial reappointment has no right of cross-examination).  Instead, the

proceeding was a "meeting" where Plaintiff had a right to appear and be heard and the COST

had total discretion to hear from others in support or opposition to his requested reappointment.

D.C. Mun. Regs. tit. 6-B, §§ 3705.17, 3705.19.  Nothing in the law or regulations authorizes

anyone to "cross-examine" persons appearing before the COST at a reappointment meeting and

Plaintiff cannot show he possessed any right to call witnesses or "cross-examine" Adams or any

other OAH staff.  *Cf.* D.C. Mun. Regs. tit. 6-B, § 3735 (procedures for formal removal hearings

before the COST during an ALJ's term explicitly provide for such rights).  To the extent his

procedural due process claim is premised on this denial, it fails.

> **2.      Plaintiff's Challenges to the COST's Composition Fail to State a
> Constitutional Deprivation Because Judge Williams and Onek Were
> *De Facto* Officers and Thus the COST's Decisions Were Valid.**

According to Plaintiff, Judge Williams and Onek could not legally vote and thus acted

*ultra vires* because they were not properly seated to the COST, thereby depriving the COST of a

quorum.  But even if there were appointment defects, the challenged COST commissioners

served as *de facto* officers.  Therefore, the COST's decisions are valid.

The Supreme Court has long recognized that the acts of public officials acting under

color of title are presumed to be valid, even if deficiencies in their appointments are later

discovered.  *See Ryder v. United States*, 515 U.S. 177, 180 (1995); *Norton v. Shelby Cty.*, 118

U.S. 425 (1886).  This common law "*de facto* officer" doctrine "was developed to protect the

public from the chaos and uncertainty that would ensue if actions taken by individuals apparently

occupying government offices could later be invalidated by exposing defects in the officials'

titles," which is exactly what Plaintiff seeks to do here.  *Equal Emp. Opportunity Comm'n v.*

*Sears, Roebuck & Co.*, 650 F.2d 14, 17 (2d Cir. 1981) (citing *Manning v. Weeks*, 139 U.S. 504, 506 (1891)).  Under Plaintiff's theory, every administrative decision by every District of Columbia ALJ appointed or reappointed since 2013 (the start of Judge Williams's tenure) will become subject to invalidation by disgruntled litigants.  This Court should reject this notion.

A *de facto* officer is one "whose title is not good in law, but who is in fact in the unobstructed possession of an office and discharging its duties in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper."  *Waite v. City of Santa Cruz*, 184 U.S. 302, 323 (1902).  The official acts of a *de facto* officer, filling a *de jure* office, done for public matters and in the public interest, are considered valid and binding as if a *de jure* officer performed them.  *Phillips v. Payne*, 92 U.S. 130, 132 (1875); *United States v. Angney*, No. 14578, 1887 WL 12666, at *6 (D.C. July 18, 1887).  When there is a *de jure* office, all that is needed to make an officer *de facto* is that the person claiming the office received it, is performing its duties, and is claiming to do so under color of right. *McDowell v. United States*, 159 U.S. 596, 602 (1895).

Plaintiff contends that Judge Williams was not a valid member of COST because her term of appointment expired before she participated in the reappointment decision and no statutory authorization existed allowing her to continue in her position as a holdover or for a retroactive appointment.  *See* Am. Compl. ¶ 152.  Although the OAH Establishment Act did not expressly authorize Judge Williams to serve beyond the expiration of her term, by holding over she still served as a *de facto* commissioner of the COST.  And a person who possesses a public office by holding over after the expiration of a previous official term and who discharges the duties of the office is *at least* a *de facto* officer.  *Waite*, 184 U.S. 302; *see also* 3 McQuillin, Municipal Corporations § 12.102 (3rd ed. 1973).  This is so even with no statutory

authorization.  *See Grooms v. LaVale Zoning Bd.*, 27 Md. App. 266, 274, 340 A.2d 385, 391 (1975) ("Under a statute which does not specifically so provide, incumbents who hold over are *de facto* rather than *de jure* officers.").  Because Judge Williams, as a holdover, retained possession of her office and continued to serve on the COST, she was a *de facto* member of the commission.  Therefore, her decisions were as "valid and binding as if they had been performed by a *de jure* officer."  *Phillips*, 92 U.S. at 132; *see also* Ex. 9, Feb. 28, 2019 Order, *Barber v. D.C. Comm'n on the Selection and Tenure of Admin. Law Judges*, 2016 CA 006576 P(MPA) (applying *de facto* officer doctrine in dismissing ALJ's suit challenging her removal on grounds that Judge Williams lacked a proper appointment at the time the COST issued its decision).

Plaintiff also argues that Judge Williams's initial appointment and reappointment by the Superior Court, in 2013 and 2017, respectively, were defective because they were not ratified by the Mayor.  Yet he does not claim that a valid appointment could not have been made under the OAH Establishment Act or that there was no *de jure* office to be filled.   *See* Am. Compl. ¶¶ 32-36 (describing how "lawful appointments of COST members are made"); *cf. United States v. Royer*, 268 U.S. 394, 397 (1925) ("Of course, there can be no incumbent *de facto* of an office if there be no office to fill.").  Instead, he says no Mayor's Order confirming Judge Williams's appointment exists.  Nothing in the OAH Establishment Act requires the Chief Judge's appointees to also be designated by Mayor's Order.  *See* D.C. Code § 2-1831.01 *et seq.*  And, in any event, he alleges only a technical defect in her appointment, and this is not enough.  *See McDowell*, 159 U.S. at 601-02.  Instead, "'[w]here an office exists under the law, it matters not how the appointment of the incumbent is made, so far as the validity of his acts are concerned.  It is enough that he is clothed with the insignia of the office . . . and exercises its powers and

functions.'" *Cardoza v. Baird*, 30 App. D.C. 86, 91 (D.C. Cir. 1907) (quoting *Norton*, 118 U.S. at 444).

Here, Judge Williams operated under the color of authority of her December 2013 Superior Court appointment.  What is more, Judge Williams has maintained an unobstructed possession of the office of COST commissioner since then, discharging the duties of that office in full view of the public.  Indeed, as Plaintiff acknowledges, Judge Williams has "functioned" as the COST chair and acted as such since 2013.  Am. Compl. ¶ 11; *see also id.* ¶ 181 (alleging that Judge Williams "acted upon power granted by D.C. law and acted under the appearance of being cloaked in the authority of the District of Columbia.").  Thus, she was always at least a *de facto* member of the COST during these proceedings.  And while Plaintiff asserts that Judge Williams's appointment was defective for lack of a ratifying Mayor's Order, he does not suggest that the Mayor questioned her authority to serve.  To the contrary, the Mayor and the public's acquiescence to her service over many years itself is enough to cloak Judge Williams with the apparent authority of a *de facto* officer.  Thus, under any theory, by having possessed the COST chairpersonship and openly performed its duties under color of title, Judge Williams served as the *de facto* chairperson of COST while overseeing Plaintiff's reappointment.

As for Onek, there is no dispute that he was operating under a valid appointment when he voted on Plaintiff's reappointment.  *See* Am. Compl. ¶ 153 n.5.  And, like Judge Williams, he served as a *de facto* Commissioner between the expiration and renewal of his term.

Plaintiff also asserts that all three voting members must be seated to conduct official business. Am. Compl. ¶ 33.  Not so.  All that is required is a quorum—"the number of members of a larger body that must participate for the valid transaction of business." *New Process Steel, L.P. v. N.L.R.B.*, 560 U.S. 674, 683-84 (2010); *see also* D.C. Code § 2-1831.10(a) (requiring

26

affirmative vote of "a majority of the voting members of COST" for reappointment).  Thus, a

COST quorum consists of two voting members.  D.C. Code § 2-1831.07(b).  Even discounting

Judge Williams, there were still two validly appointed Commissioners who both voted against

Plaintiff's reappointment—Hawkins and Onek.  *See* Am. Compl. ¶ 153. Thus, the vote does not

fail for lack of a COST quorum, regardless of Judge Williams's status.

### 3. The COST's Purported Violations of the Open Meetings Act Do Not Amount to a Constitutional Violation.

Plaintiff's contention that the COST's internal deliberations violated the District's Open

Meetings Act (OMA) likewise does not amount to a constitutional violation.  Meeting to discuss

process and deliberating on personnel matters is the COST's purpose and is not prohibited by the

OMA.  And the OMA allows for the closure of public meetings, *i.e.* "Executive Session," to

"discuss the appointment, employment, assignment, promotion, performance evaluation,

compensation, discipline, demotion, removal, or resignation of government appointees,

employees, or officials."  D.C. Code § 2-575(b)(l0).  Here, Plaintiff identifies no impropriety

beyond pointing to technical violations of the OMA.  *See* Am. Compl. ¶¶ 118-19, 133, 141, 157.

But a "mere violation of law does not give rise to a due process claim."  *AFGE, AFL–CIO, Local*

*446 v. Nicholson*, 475 F.3d 341, 353 (D.C. Cir. 2007).[5]  Accordingly, even if the COST engaged

in technical violations of District law, such violations did not deprive Plaintiff of his

constitutional due process rights because he still received notice and an opportunity to be heard.

---

[5]       *See also Duckett v. Quick*, 282 F.3d 844, 848 (D.C. Cir. 2002) (holding due process was
not violated by agency's failure to comply with D.C. regulations); *Doe by Fein v. District of
Columbia*, 93 F.3d 861, 868 (D.C. Cir. 1996) (noting that the violation of state or local law
procedures is not, in itself, a constitutional violation); *Brandon v. District of Columbia Bd. of
Parole*, 823 F.2d 644, 648–49 (D.C. Cir. 1987) (holding that a state does not violate an
individual's due process rights by deviating from its own procedures).

**4.     Plaintiff Was Not Entitled to Notice of Alleged *Ex Parte*
Communications, and the Alleged Communications Were Not
Improper and Did Not Taint the COST's Decision.**

Next, Plaintiff accuses Defendants of engaging in and not disclosing allegedly improper
*ex parte* communications.  He claims that Judge Williams "collected biased prejudicial evidence
against [him] by taking *ex parte* calls from ALJ acquaintances opposed to his reappointment,"
Am. Compl. ¶ 123(a), and that the COST improperly engaged in communications with Natale
and other employees in OAH's general counsel's office, *see id.* ¶¶ 123(d), 129, 134.  These
allegations do not state a due process claim.

First, the COST's members are not prohibited from engaging in *ex parte* communications
by law or regulation and need not provide notice of their *ex parte* communications.  *See* D.C.
Code § 2-1831.10; D.C. Mun. Regs. Subt. 6-B, § 3705; *cf.* D.C. Mun. Regs. tit. 6-B, § 549
(prohibiting *ex parte* communications in proceedings before the D.C. Public Employee Relations
Board).  The only communications that the COST is required to provide to an ALJ seeking
reappointment are "copies of any comments it receives" in response to its solicitation for public
comments published in the D.C. Register.  D.C. Mun. Regs. tit. 6-B, § 3705.9.  That is, it must
provide *written* comments obtained during the public comment period, which Plaintiff does not
dispute occurred.

And even if the alleged *ex parte* communications were improper, undisclosed *ex parte*
communications during agency proceedings do not necessarily void an agency decision.  Under
*Prof'l Air Traffic Controllers Org. v. Fed. Labor Relations Auth.* (*PATCO*), 685 F.2d 547, 564–
65 (D.C. Cir. 1982), in determining whether an agency's proceedings are void based on *ex parte*
communications, a court must consider whether, as a result of improper *ex parte*
communications, the agency's decision-making process was "irrevocably tainted so as to make

28

the ultimate judgment of the agency unfair."  685 F.2d at 564-65.[6]  Here, Natale's legal analysis

and Judge Williams's conversations with personal and professional friends did not "irrevocably

taint" the COST's decision-making and had "no effect on the ultimate decision."[7]  Indeed, by the

time of Plaintiff's June 29, 2017 meeting, the COST had already received Adams's negative

recommendation, which is due "significant weight."  D.C. Code § 2-1831.10; D.C. Mun. Regs.

tit. 6-B, § 3705.21.  Judge Williams also said that she had conducted a "review of the

documentation," *i.e.* Adams's recommendation letter and its attachments (including the solicited

public comments).  Am. Compl. ¶ 123(a).  The allegedly improper *ex parte* communications that

she received merely described Plaintiff's conduct in a consistent, though far less specific, manner

as the documentation already in the record.  The same is true for Natale's legal opinion and her

characterization of Plaintiff's conduct.  Accordingly, even if these communications were

improper, Plaintiff can show no prejudice because they added no new and material information.[8]

> **5.**      **The COST's Regulations Do Not Preclude Deliberations About a Reappointment Before a Meeting with an ALJ and Adams's Participation in the Deliberations Was Proper.**

---

[6]      The court also identified several factors that "may be relevant" but cautioned against their "mechanical" application.  *PATCO*, 685 F.2d at 564-65.

[7]      Plaintiff also refers to "over 150 separate emails" between the individual defendants and OAH's General Counsel's staff, Am. Compl. ¶ 150, but he does not identify the substance of these alleged emails, why they were improper, and how, if at all, they had any bearing on the COST's ultimate decision.

[8]      *Cf. Shinseki v. Sanders*, 556 U.S. 396 (2009) (establishing that administrative adjudications are subject to the same harmless error rule as generally applies to civil cases and determination of prejudice required for reversal); *Young v. Dep't of Hous. & Urban Dev.*, 706 F.3d 1372, 1376 (Fed. Cir. 2013) (in hearings for federal employees challenging disciplinary actions where they have protected property interest, "only *ex parte* communications that introduce new and material information," rather than only "cumulative" information to the deciding official, violate the due process guarantee of notice).

Finally, Plaintiff complains that the COST was biased and pre-judged his case before he had a chance to be heard. Am. Compl. ¶¶ 118-126, 169. This does not amount to a constitutional violation.

Plaintiff does not point to anything in the law that precluded the alleged internal debate at the COST's June 29, 2017 meeting. *Id.* at 118-126. Indeed, under the regulations, "[i]f an [ALJ] has filed a request to appear before the Commission, the Commission may not *vote* on his or her reappointment or issue a notice of grounds for possible denial or appointment unless it affords the [ALJ] an opportunity to appear before it." D.C. Mun. Regs. tit. 6-B, § 3705.15 (emphasis added). The COST did not vote on Plaintiff's reappointment before the June 2017 meeting and nothing in the regulations governing the COST preclude internal pre-meeting discussions or deliberations about the merit of an application for reappointment.

Similarly, Plaintiff's quibbles about Adams's role in deliberations and meetings do not advance Plaintiff's cause. *See* Am. Compl. ¶¶ 116, 127, 137, 154. Adams's role is defined by statute and regulations, and under both he could participate in the COST's deliberations about Plaintiff's reappointment. By statute, he is a member of the COST, not a party to an adversarial proceeding. D.C. Code § 2-1831.07(a). And although Adams, as OAH's CALJ, is not a voting member of the COST, the OAH Establishment Act places no limits on his participation in its deliberations. To the contrary, both the OAH Establishment Act and the regulations contemplate the CALJ's active involvement in those discussions by providing that, when deciding whether to reappoint an ALJ, the "members of COST" or "the Commission"—not just its "voting members"—"shall consider all information received" about the reappointment. D.C. Code § 2-1831.10(b); D.C. Mun. Regs. tit. 6-B § 3706.21. And Plaintiff's characterization of Adams sitting "in judgment of his own recommendation," Am. Compl. ¶¶ 127, 137, 154, is baseless

because Adams was an *ex officio* member, not a voting member, and therefore could not—and did not—vote on Plaintiff's non-reappointment.  Moreover, an individual performing dual functions within an agency, such as investigative and judicial functions, does not offend due process considerations *per se*.  *See generally Withrow v. Larkin*, 421 U.S. 35 (1975).

## II.     Plaintiff Fails to State a First Amendment Retaliation Claim.

Plaintiff fails to state a plausible First Amendment retaliation claim.  First, he did not speak as a citizen on a matter of public concern by signing the 2012 letter about CALJ Walker or advocating for union consultation on the creation of a new PALJ position within OAH.  Second, Plaintiff's factual allegations raise no inference whatsoever that either of these speech activities was a substantial or motivating factor in his non-reappointment.  Finally, Plaintiff does not state a retaliation claim based on his associational rights because he does not allege that Defendants deprived him of his right to associate with a union, his union-related advocacy is unprotected employee speech under the public concern requirement, and he does not allege any facts giving rise to an inference that either his efforts to organize a union or his union membership was a substantial or motivating factor in his non-reappointment.

### A.     Standard of Review for First Amendment Retaliation Claims Based on Employee Speech

To make out a claim of retaliation in violation of First Amendment rights, a public employee must meet a four-part test.  The first element has two sub-parts:  for the speech to be protected, the employee must have spoken (1) as a citizen (2) on a matter of public concern.  *See Garcetti v. Ceballos*, 547 U.S. 410, 418-20 (2006); *Mpoy v. Rhee*, 758 F.3d 285, 290 (D.C. Cir. 2014).  "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti*, 547 U.S. at 421.  In

31

applying *Garcetti*, the D.C. Circuit has "consistently held that a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command." *Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009) (collecting cases).

To determine whether speech "'was made pursuant to official responsibilities, the Court must take a hard look at the context of the speech.'" *Mpoy*, 758 F.3d at 292 (quoting *Decotiis v. Whittemore*, 635 F.3d 22, 32 (1st Cir. 2011)). Speech only involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citation omitted). This inquiry also turns on the "content, form, and context" of the speech. *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Speech is not on a matter of public concern when it "deals with individual personnel disputes and grievances" that are not relevant "to the public's evaluation of the performance of governmental agencies." *Murray v. Gardner*, 741 F.2d 434, 438 (D.C. Cir. 1984). "If the speech is not of public concern, it is unnecessary to scrutinize the basis for the adverse action absent the most unusual circumstances." *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998) (quoting *Tao v. Freeh*, 27 F.3d 635, 638-39 (D.C. Cir. 1994)).

Under the second factor, the court must consider whether "the governmental interest in 'promoting the efficiency of the public services it performs through its employees' without disruption . . . outweighs the employee's interest, 'as a citizen, in commenting upon matters of public concern.'" *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). The third and fourth factors require the employee to show that his speech was "a substantial or motivating

factor" in prompting the retaliatory act and then to refute any showing by the government "that it would have reached the same decision in the absence of the protected speech." *Id.* The first two factors are questions of law for the court to resolve, while the latter two are ordinarily questions of fact. *Tao*, 27 F.3d at 639.

      **B.**    **Plaintiff Did Not Speak as a Citizen on a Matter of Public Concern.**

Plaintiff spoke pursuant to his official duties, not as a citizen, when he signed the 2012 letter about the administration of OAH. Plaintiff alleges that Defendants retaliated against him for his "his work to fight against corruption within OAH," presumably referring to the June 13, 2012 letter Plaintiff signed asking Councilmember Mendelson and Mayor Gray to investigate CALJ Walker. Am. Compl. ¶¶ 2, 46. This letter is not protected employee speech for two reasons. First, Plaintiff and the other signatories identified themselves in the letter as ALJs and "tenured judges" speaking "to protect the integrity of OAH" in furtherance of their oath to preserve and protect OAH as an institution. Ex. 1. Thus, by the letter's words, Plaintiff was speaking pursuant to his official responsibilities, not as a citizen. *See Pearson*, 644 F. Supp. 2d at 39 (plaintiff, a former OAH ALJ, "repeatedly identified himself in his professional capacity rather than his personal capacity" and thus did not speak as citizen); *Mpoy*, 758 F.3d at 291 (teacher spoke pursuant to official responsibilities in email to chancellor raising concerns about school principal by identifying himself as a teacher). Second, the letter identified several "troubling actions by [Walker] that have made it harder for [ALJs] and support staff to do their jobs," expressed concerns about policies that affected the "orderly administration of [the ALJs'] dockets," and sought assistance in correcting "any wrongdoing that stands in the way of the fair and efficient operation of [OAH]." Ex. 1. Yet "such attempts to expose wrongdoing are not covered by the First Amendment where the speech is pursuant to an official duty," as here.

*Winder*, 511 F. Supp. 2d at 174 (citation and quotation marks omitted).  Thus, the letter served

no purpose other than reporting interference with Plaintiff's ability to perform the responsibilities

of his office and it is therefore unprotected by the First Amendment.  *See Mpoy* 758 F.3d at 291-

92; *Winder*, 511 F. Supp. 2d at 174; *see also* D.C. Code § 2-1831.08(a) (ALJs shall be

accountable and responsible for the fair, impartial, effective, and efficient disposition of cases to

which they are assigned by the CALJ); *id.* § 2-1831.09 (identifying responsibilities of ALJ to

include cooperation to achieve the efficient and effective administration of OAH).  Accordingly,

the letter cannot sustain a First Amendment retaliation claim.

 Nor can Plaintiff's speech related to the creation of a new PALJ position support a First

Amendment claim, because this speech was also part of his job duties.  Indeed, the D.C. Code

explicitly provides that Plaintiff's duties as an ALJ include commenting upon and shaping OAH

personnel policy.  *See* D.C. Code § 2-1831.09(a) (an ALJ is required to "[f]ully participate in . . .

management activities to set and steer policies relating to Office operations, including, without

limitation, personnel matters").  And Plaintiff's position as union president does not overcome

the fact that his alleged protected activities were "specific recommendations regarding internal

office policy that directly related to his job," which receive no First Amendment protection.

*Pearson*, 644 F. Supp. at 39; *see also Thompson v. District of Columbia*, 530 F.3d 914, 916

(D.C. Cir. 2008) ("Ordinarily, employees who make recommendations to their supervisors on

subjects directly related to their jobs are carrying out their official duties and thus receive no

First Amendment protection.").

 This speech also did not touch on a matter of public concern.  Rather, Plaintiff's speech

concerned an internal personnel matter.  Even though personnel matters *may* touch on matters of

public concern, *see LeFande v. District of Columbia*, 613 F.3d 1155, 1160 (D.C. Cir. 2010), the

creation of a single administrative position—a PALJ for Information and Technology—does not concern "important issues of [OAH] policy" or the "overall structure and governance of [OAH] generally." *See id.* 1158-60 (citations and quotation marks omitted). Nor does Plaintiff allege how the issues he raised had any relevance to the public's evaluation of the performance of OAH as an agency or its administration of justice in matters within its jurisdiction. *See Murray*, 741 F.2d at 438. The First Amendment does not require a public office to be "run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149. Thus, it does not empower public employees to "constitutionalize the employee grievance" as Plaintiff strives to do here. *Garcetti*, 547 U.S. at 420.

For these reasons, Plaintiff did not speak as a citizen on a matter of public concern and his First Amendment retaliation claim therefore fails. As a result, the Court need not go any further its analysis. *See O'Donnell*, 148 F.3d at 1133 ("If the speech is not of public concern, it is unnecessary to scrutinize the basis for the adverse action absent the most unusual circumstances.") (citation and quotation marks omitted).

### C.     Neither Plaintiff's 2012 Letter nor His Union Advocacy Was a Substantial or Motivating Factor in His Non-Reappointment.

Although Plaintiff's failure to allege speech made as a citizen on a matter is dispositive of his First Amendment claim, Plaintiff also fails to allege any facts giving rise to a plausible inference that his speech or speech-related union activities was a factor, let alone a substantial or motivating factor, in his non-reappointment.

First, the temporal proximity between Plaintiff's 2012 letter and his 2017 non-reappointment is far too remote to support any inference of retaliation. "[N]either the Supreme Court nor the [D.C. Circuit] has established a bright-line three-month rule," *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012), but generally a three-month gap between

protected activity and an adverse employment action is too attenuated to infer causation.  *See Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (rejecting interval of two and a half months as establishing temporal proximity and citing with approval cases that did not find temporal proximity when two to three months elapsed between the protected activity and adverse employment action); *see also Scahill v. District of Columbia*, 271 F. Supp. 3d 216, 236 (D.D.C. 2017) (granting motion to dismiss First Amendment retaliation claim where plaintiff alleged five month gap between protected activity and retaliatory action), *aff'd*, 909 F.3d 1177 (D.C. Cir. 2018).  Here, Plaintiff alleges a period of *five years* between his 2012 speech and his non-reappointment, far beyond the recognized "outer limit" to raise an inference of causation.

And Plaintiff alleges no other facts that support such an inference.  *See Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 69 (D.C. Cir. 2015).  According to Plaintiff, Adams's letter referenced actions Plaintiff took as union president to justify his recommendation to not reappoint him. Am. Compl. ¶¶ 179-80.  Not so.  Adams's recommendation mentions the 2012 letter, but it is readily apparent that Plaintiff's contribution to the letter is not a basis for his recommendation against reappointment.  *See* Ex. 2; *see also Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) (district court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice").  Adams referenced the letter to provide context to the lingering tension at OAH that preceded Plaintiff's confrontational conduct toward Yahner in 2014, conduct that was part of a pattern that *did* factor into the recommendation.  *See* Ex. 2; Am. Compl. ¶ 145.  And Plaintiff does not allege that Adams or any other COST commissioner was a "supporter," of CALJ Walker, the subject of the letter, *id*. ¶ 52, or that the letter was ever discussed at any of meeting of the COST.  *Id.* ¶¶ 123-25, 131-42; 154-57.

In addition, Plaintiff's allegation that Natale made comments about his union membership and tied his reappointment to his influencing the union to take actions that she wanted, Am. Compl. ¶ 180, though closer in time to his non-reappointment, is also not enough to raise any inference of causation.  Natale was not a voting or *ex officio* member of the COST, and Plaintiff does not allege that either he or Natale ever raised this purported conversation with the COST.  Nor could he credibly so allege, as both Plaintiff and Natale testified that they never discussed their alleged conversation with Adams.  Ex. 3 at 3.  PERB also found that Adams was not aware of the alleged conversation when he made his recommendation.  *Id.*[9]  As Plaintiff alleges no facts giving rise to an inference that his speech was a substantial or motivating factor in his non-reappointment, the Court should dismiss Count II of the Amended Complaint.

### D.     Plaintiff Does Not State a First Amendment Retaliation Claim Based on Associational Rights

Plaintiff seeks to broadly frame his First Amendment retaliation claim as one based on his exercise of associational rights, rather than just his free speech rights.  *See* Am. Compl. ¶ 4. (alleging Defendants "violated [his] right to free and fair association under the Constitution" by

---

[9]     Additionally, Plaintiff is collaterally estopped from relitigating PERB's conclusion that Plaintiff's union activity concerning the new PALJ position was not a substantial or motivating factor in Adams's recommendation against reappointment.  *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991) (collateral estoppel applies to final determinations by administrative agencies acting in judicial capacity and "[s]uch repose is justified on the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise").  Although Plaintiff (and the individual defendants here) was not a party to that decision, there are many exceptions to the requirement of identical parties, most pertinent here being where a party sought to be barred may be bound by a judgment because he was "adequately represented by someone with the same interests who [wa]s a party" to the prior suit, or where he assumed such control over the prior litigation that he can be said to have "had his day in court even though he was not a formal party." *Taylor v. Sturgell*, 553 U.S. 880, 894-95 (2008) (citations and quotation marks omitted); *see also Gulf Power Co. v. F.C.C.*, 669 F.3d 320, 323 (D.C. Cir. 2012).  Plaintiff, as president of FALJ and the individual subjected to the alleged unfair labor practices challenged in the PERB proceeding, falls within both exceptions.

"remov[ing] [him] from his post as retaliation against his attempts to organize his fellow ALJs"); *id.* ¶ 179 (claiming Defendants retaliated against him for "being a member of the union and by his taking action in support of union interests").  But Plaintiff's claim fails under this theory because he has not shown any deprivation of his right to associate with a union and he cannot disentangle his union activities related to the PALJ position from his employee speech, which, as already described, lacked First Amendment protection under the public concern requirement. Moreover, Plaintiff's allegations raise no inference that his union organization activities or union membership had anything to do with his non-reappointment, and therefore his claim does not cross the line from merely possible to plausible.

As an initial matter, Plaintiff makes no claim that he was "prohibited . . . from joining together in a union, or from persuading others to do so, or from advocating any particular ideas." *Smith v. Arkansas State Highway Emp., Local 1315*, 441 U.S. 463, 465 (1979) (noting that there is no claim for First Amendment retaliation or discrimination without such allegations).  Plaintiff therefore fails to allege a violation of his First Amendment right to association.

In any event, his union membership or activities do not support a First Amendment claim. The D.C. Circuit has not addressed whether the public concern requirement applies to a First Amendment retaliation claim premised on a public employee's exercise of associational rights through participation in union activities, rather than the employee's speech.  The Second, Fourth, Sixth, and Seventh Circuits apply the public concern requirement to public employee association claims.  *See Cobb v. Pozzi*, 363 F.3d 89, 107 (2d Cir. 2004); *Edwards v. City of Goldsboro*, 178 F.3d 231, 249-50 (4th Cir. 1999); *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir. 1985); *Klug v. Chi. Sch. Reform Bd. of Trs.*, 197 F.3d 853, 857 (7th Cir. 1999).  The Ninth Circuit applies the public concern requirement to "hybrid" freedom-of-speech and right-of-association claims.  *Hudson v.*

*Craven*, 403 F.3d 691, 698 (9th Cir. 2005).  To the extent that Plaintiff alleges that Defendants

retaliated against him for his "union activities" related to his advocacy about the PALJ position,

the speech and associational rights at issue are "so intertwined" that there is no basis for

differentiating the case from a pure speech case.  *Hudson*, 403 F.3d 696–97.  Thus, Plaintiff's

claim still fails on the public concern prong for the reasons discussed in Section II.B.

   Nor has the D.C. Circuit held that an employee's union membership alone touches on a

matter of public concern for a First Amendment retaliation claim.[10]  Assuming that it does, *see*

*Dist. Council 20, Am. Fed'n of State, Cty. & Mun. Employees, AFL CIO v. District of Columbia*,

150 F. Supp. 2d 136, 143 (D.D.C. 2001) (concluding "union membership and the activity alleged

in this case meet the public concern test"), Plaintiff still fails to state a claim because he does not

allege any facts showing that his union membership or union organization activity was a

substantial or motivating factor in his non-reappointment.[11]  *See Am. Fed'n of Gov't Employees*

*TSA Local 1 v. Hawley*, 481 F. Supp. 2d 72, 96 (D.D.C. 2006) (granting motion to dismiss First

Amendment retaliation claim because plaintiffs did not allege defendant based its selection of

plaintiffs for a reduction-in-force on their union membership).  Moreover, of the 186 paragraphs

in his amended complaint, Plaintiff makes only one allegation about his effort to lead the ALJ's

unionization:  "CALJ Walker and her supporters" opposed the unionization effort and Plaintiff's

leadership of the effort "intensified the animus against him from Walker supporters."  Am.

Compl. ¶ 52.  But this unionization effort occurred five years before Plaintiff's non-

---

[10]  Employee speech related to union organization touches on a matter of public concern,
*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 830 F.2d 294, 301 (D.C. Cir. 1987),
but Plaintiff offers no facts to support an inference that his role in organizing a union factored
into the reappointment decision.
[11]  Again, Plaintiff is collaterally estopped from relitigating this issue, having already lost
after a full and fair hearing before PERB.  Ex 3.

reappointment, which, as discussed above, is too attenuated to raise any inference of causation. And Plaintiff does not allege that Adams, or any other COST commissioner, had supported Walker, had opposed the ALJs' unionization, or had any animus toward him based on his union leadership or any animus toward unions generally.  *See* Am. Compl.  In fact, Plaintiff concedes that Adams appointed him to be the PALJ for the OAH Employment Cluster, despite knowing that he was union president.  *Id.* ¶ 42.  And, critically, Plaintiff's union membership or efforts to organize the union are not mentioned in Adams's recommendation letter.  *See* Ex 2.  Nor does Plaintiff allege that the COST discussed his union membership or efforts to organize the union at any meeting where his reappointment was considered.  Am. Compl. ¶¶ 123-25, 131-42, 154-157. Because Plaintiff fails to allege any facts giving rise to an inference that his union membership, his union organization activities, or any generalized union activity were substantial or motivating factors in his non-reappointment, the Court should dismiss Plaintiff's First Amendment retaliation claim.

## III.    **The Individual Defendants Are Entitled to Qualified Immunity.**

Defendants Adams, Hawkins, Onek, Wilburn,[12] and Judge Williams are entitled to qualified immunity from Plaintiff's § 1983 claims against them in their personal capacities.[13]

---

[12]    Plaintiff fails to allege Wilburn's personal involvement in any constitutional deprivation. She is a non-voting member of the COST, Am. Compl. ¶ 8, and Plaintiff makes no allegations whatsoever about any actions she allegedly took against him.  *See* Am. Compl.  Thus, the Court should dismiss her from this action.  *See, e.g.*, *Stone v. Walsh*, 756 F. Supp. 2d 4, 7 (D.D.C. 2010) (dismissing § 1983 claims against District official because his direct involvement in the violations was not alleged); *Crowder v. Bierman, Geesing, & Ward LLC*, 713 F. Supp. 2d 6, 8 (D.D.C. 2010) (dismissing § 1983 claims against individual defendants because the complaint failed to make any factual allegations against them).

[13]    To the extent Plaintiff sues these individuals in their official capacities, such claims should be dismissed as duplicative of his claims against the District because there is no need "'to bring official-capacity actions against local government officials, for . . . local government units can be sued directly for damages or injunctive relief.'"  *Mack v. Aspen of DC, Inc.*, 248 F. Supp. 3d 215, 218 (D.D.C. 2017) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

*See Pearson*, 644 F. Supp. 2d at 36 (finding members of the COST are shielded by qualified immunity).

Under the doctrine of qualified immunity, courts may not award damages against a government official in her personal capacity unless "the official violated a statutory or constitutional right," and "the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "Clearly established" means that, at the time of the employee's conduct, the law was "sufficiently clear that *every* reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citations and quotations omitted) (emphasis added). Under this "demanding standard," "existing law must have placed the constitutionality of the [employee]'s conduct beyond debate"; the doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (citations and quotations omitted). To be clearly established, "a legal principle must have a sufficiently clear foundation in then-existing precedent," and must be "settled law." *Id.* The rule must be "dictated," and not just suggested, by "'controlling authority' or a robust 'consensus of cases of persuasive authority.'" *Id.* at 589-90 (quoting *al-Kidd*, 563 U.S. at 741-42). The "'clearly established' standard also requires that the legal principle clearly prohibit the [employee's] conduct in the particular circumstances before him." *Id.* at 590. Questions of qualified immunity should be determined at the earliest possible stage of the litigation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Here, the individual defendants are entitled to qualified immunity because they did not violate any clearly established right. Plaintiff contends that the individual defendants should have known that an "improperly seated tribunal, improper *ex parte* contacts, the bias of the tribunal, and the lack of ability to effectively counter those who made accusations, were all

41

violations of [his] clearly established due process rights," Am. Compl. ¶ 173, but no existing

precedent clearly established any such rights at the time the defendants acted in the specific

circumstances of the OAH ALJ reappointment process.  In fact, *Pearson*, affirmed by the D.C.

Circuit, held that the members of the COST were entitled to qualified immunity from the

plaintiff's First Amendment retaliation and Fifth Amendment due process claims challenging his

non-reappointment as an ALJ.  *Pearson*, 644 F. Supp. 2d at 36, *aff'd*, 377 F. App'x 34.

When the COST made its decision, existing precedent provided that an ALJ's complaints

about OAH's operating procedures, disseminated to the D.C. Council, are not protected by the

First Amendment.  *See Pearson*, 644 F. Supp. 2d at 40.  And even if Plaintiff could demonstrate

that his union-related advocacy about the PALJ position touched on a matter of public concern or

was a substantial or motivating factor behind his non-reappointment, no binding precedent

dictated that such an intra-office personnel disagreement satisfied the public concern prong under

the Supreme Court's First Amendment retaliation rubric.  As a result, the individual defendants

are entitled to qualified immunity on Plaintiff's due process and First Amendment retaliation

claims.[14]

---

[14]    Although no court has yet so held, the individual defendant COST members may also be
protected by absolute immunity.  Judge Williams acted in a judicial capacity; indeed, she was
appointed by the Chief Judge of the Superior Court of the District of Columbia as the COST
chair and was vested with statutory responsibilities related to the judicial process, specifically to
ensure "the recruitment and retention of a well-qualified, efficient, and effective corps of [ALJs]
in [OAH]."  Am. Compl. ¶ 23 (citing D.C. Code § 2-1831.06(a)).  The other individual
defendants may also absolutely immune.  Indeed, the selection and reappointment of
administrative law judges is just as, if not more, closely related to the judicial process as the
selection of attorneys and criminal investigators to a CJA panel, duties that have been found
sufficiently related to the judicial process to warrant absolute immunity for Public Defender
Service employees, *King*, 449 F.3d at 1286-87, and the President of the Superior Court Trial
Lawyers Association, *Bean v. D.C. Courts*, 930 F. Supp. 2d 93, 97 (D.D.C. 2013); *see also
Wagshal v. Foster*, 28 F.3d 1249, 1252 (D.C. Cir. 1994) (collecting other cases).

**IV.**    <u>**Plaintiff Fails to Allege Any Plausible Basis for the District's Municipal Liability.**</u>

Plaintiff does not allege any plausible basis to hold the District liable under § 1983.  To sufficiently allege municipal liability under § 1983, Plaintiff must establish an underlying constitutional violation *and* a basis for municipal liability.  *See Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008); *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  A municipality can only be "found liable under Section 1983 where the municipality itself causes the constitutional violation at issue."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978)).  Thus, "*respondeat superior* or vicarious liability will not attach under Section 1983" to a municipality.  *Id.* at 385 (citing *Monell*, 436 U.S. at 694-95).  Instead, a plaintiff must allege facts showing that the constitutional violation resulted from:  (1) "the explicit setting of a policy by the government that violates the Constitution," (2) "[t]he action of a policy maker with the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become custom," or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations."  *Baker*, 326 F.3d at 1306-07.

Plaintiff does not allege any of the four bases for municipal liability.  First, Plaintiff does not allege that an explicit municipal policy set by the District violates the Constitution; to the contrary, Plaintiff repeatedly alleges that the COST violated his due process rights by *deviating* from the procedures outlined in the law and regulations governing ALJs' reappointment.  *See* Am. Compl. ¶ 171.  Second, Plaintiff has not shown that the alleged unconstitutional conduct can be considered a custom of the District.  "To clear this high hurdle," Plaintiff must allege

practices "so persistent and widespread as to practically have the force of law." *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013) (citation omitted).  Plaintiff alleges that the District has a custom "that allowed for the anti-union bias to permeate decisions made about [his] tenure based on his affiliation with the union," Am. Compl. ¶ 182, but his allegations about this purported custom are limited to his case alone, which is insufficient to allege a custom.  *See Sheller-Paire v. Gray,* 888 F. Supp. 2d 34, 40 (D.D.C. 2012) (granting the District's 12(b)(6) motion because four other alleged incidents did not amount to a "persistent, pervasive practice of the city officials"); *Tabb v. District of Columbia*, 605 F. Supp. 2d 89, 96 (D.D.C. 2009) (one incident of alleged retaliation against plaintiff does not qualify as pervasive).  Likewise, Plaintiff's allegations that the COST customarily violates the "notice requirements and open meeting requirements of the [OMA]" and that "serious concerns have been raised by others aside from [Plaintiff] about the validity of the appointments of both Williams and Onek," Am. Compl. ¶ 171, do not allege a municipal custom.  Again, Plaintiff does not identify any other instance where an ALJ was denied due process during their reappointment because of violations of the OMA.  *See Tabb*, 605 F. Supp. 2d at 96.

Plaintiff cannot establish municipal liability through a policymaker theory, either.  Although the COST has authority to render final reappointment decisions in individual cases, D.C. Code § 2-1831.06(b), "such discretion is insufficient to create municipal liability unless the decisionmaker had been granted final policymaking authority under D.C. law . . . ."  *Singletary v. District of Columbia*, 766 F.3d 66, 74 (D.C. Cir. 2014).  Here, the COST does not have final policymaking authority because any proposal by the COST to amend, repeal, or add to the initial rules promulgated by the Mayor is subject to Council approval.  D.C. Code § 2-1831.11(b).  Therefore, any "decision to depart from those policies" in deciding Plaintiff's request for

44

reappointment "was not an act of the municipality for purposes of § 1983." *Singletary*, 766 F.3d at 74 (citation and quotation marks omitted).

Finally, Plaintiff cannot proceed under a deliberate indifference theory. This theory is premised on the failure of the government to respond to a need, such as training of employees, in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations. *Baker*, 326 F.3d at 1306–07. Here, Plaintiff cannot show that the District failed to respond to any known need to address its procedures for ALJ reappointments or risk resulting constitutional violations. Indeed, only one constitutional challenge has ever been pressed with respect to such procedures, and that court held that the procedures afforded due process under the Fifth Amendment. *Pearson*, 644 F. Supp. 2d at 45. Nor can Plaintiff show that the District failed to respond to any need to shield ALJs from First Amendment retaliation in the reappointment process. That the District knew a "prior Chief ALJ had anti-union bias" is of no moment; Plaintiff does not allege that Adams (or any other COST commissioner) had any such bias, that the District knew or should have known of any such anti-union animus on the part of any commissioner, and that the District then failed to respond. Am. Compl. ¶ 182. Once again, Plaintiff has not pointed to any pattern—or any instances at all—of similar previous violations by the COST that might have alerted the District to this particular risk. *See Cherry v. District of Columbia*, 330 F. Supp. 3d 216, 226 (D.D.C. 2018). Plaintiff failed to allege municipal liability, and thus his § 1983 claims against the District cannot stand.

## CONCLUSION

For these reasons, the Court should grant Defendants' motion to dismiss and dismiss the Amended Complaint with prejudice.

Date:   August 3, 2020                    Respectfully Submitted,

                                          KARL A. RACINE
                                          Attorney General for the District of Columbia

                                          CHAD COPELAND
                                          Deputy Attorney General
                                          Civil Litigation Division

                                          */s/ Christina Okereke*
                                          CHRISTINA OKEREKE [219272]
                                          Chief, Civil Litigation Division Section II

                                          */s/ David A. Jackson*
                                          DAVID A. JACKSON [471535]
                                          Assistant Attorney General
                                          Office of the Attorney General
                                          441 Fourth Street, NW
                                          Suite 630 South
                                          Washington, D.C. 20001
                                          (202) 724-6618 (Direct Line)
                                          (202) 436-2598 (Cell Phone)
                                          (202) 741-8999 (Fax)
                                          davida.jackson@dc.gov

                                          */s/ Steven N. Rubenstein*
                                          STEVEN N. RUBENSTEIN [1013094]
                                          Assistant Attorney General
                                          441 Fourth Street, N.W.
                                          Suite 630 South
                                          Washington, D.C. 20001
                                          (202) 727-9624
                                          (202) 741-0592 (fax)
                                          Steven.Rubenstein3@dc.gov

                                          *Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

JESSE GOODE,

              Plaintiff,

      v.

DISTRICT OF COLUMBIA, *et al*.,

           Defendants.

No. 20-cv-1332-RJL

---

**ORDER**

Upon consideration of Defendants' Motion to Dismiss the Amended Complaint, any opposition and reply thereto, and the entire record herein, it is by the Court this _____ day of _____, 2020, hereby

**ORDERED** that the Defendants' Motion is **GRANTED**; and it is further

**ORDERED** that the Amended Complaint is **DISMISSED WITH PREJUDICE**

**SO ORDERED.**

_____
Richard J. Leon
United States District Judge