# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JESSE GOODE,                        )
                                    )
          **Plaintiff,**          )
                                    )
    **v.**                         )     Civil Case No.  20-01332 (RJL)
                                    )
**DISTRICT OF COLUMBIA, et al.,**   )
                                    )
          **Defendants.**         )

## MEMORANDUM OPINION
(March 30, 2021) [Dkt. #25]

Plaintiff Jesse Goode ("plaintiff") brings this action under 42 U.S.C. § 1983 against the District of Columbia ("District") and five members of the Commission on Selection and Tenure of Administrative Law Judges of the Office of Administrative Hearings ("COST") in their official and personal capacities (collectively "defendants"). Am. Compl. [Dkt. #22] ¶ 1.  Plaintiff alleges that defendants denied him reappointment to a third term as an Administrative Law Judge ("ALJ") in retaliation for his union-related activities in violation of his First and Fifth Amendment rights.  *Id.*  Plaintiff seeks money damages for these alleged constitutional deprivations as well as injunctive relief in the form of an order reinstating him as an ALJ.  *Id.* at 32.  Presently before the Court is defendants' Motion to Dismiss the Amended Complaint ("Defs.' Mot.") [Dkt. #25]. Upon consideration of the parties' pleadings, relevant law, the entire record herein, and for the reasons state below, I GRANT defendants' motion and DISMISS this action in its

1

entirety.

## BACKGROUND

In 2002, the Council of the District of Columbia ("D.C. Council") established the Office of Administrative Hearings ("OAH") through the Office of Administrative Hearings Establishment Act ("Establishment Act"). *See* D.C. Code § 2–1831.01 *et seq.* OAH is comprised of a panel of ALJs who decide cases arising from more than forty separate agencies, boards, and commissions within the District. *See id.* To manage OAH personnel, the Establishment Act created COST, empowered with "final authority to appoint, reappoint, discipline, and remove [ALJs]." *Id.* § 2–1831.06(b).

COST is comprised of five members, three of whom have voting power. Of the three voting members, one is appointed by the Mayor, one by the Chairman of the D.C. Council, and one by the Chief Judge of the Superior Court of the District of Columbia. *Id.* § 2–1831.07(a).[1] During the relevant period, defendant Robert Hawkins served as the mayoral voting member, defendant Joseph Onek served as the D.C. Council voting member, and defendant Yvonne Williams served as the Superior Court voting member. Am. Compl. ¶¶ 9–11. Plaintiff alleges defendant Onek's appointment was deficient at the time plaintiff was being considered for reappointment because his term expired on April 30, 2017 and he was not properly reappointed until September 22, 2017. Am. Compl. ¶ 10. Plaintiff also alleges defects in defendant Williams's appointment, asserting it either was never valid because it was not confirmed by a mayoral order or that

---

[1] These COST members serve 3-year staggered terms. D.C. Code § 2-1831.07(c).

it had lapsed as of April 30, 2015.  Am. Compl. ¶¶ 11, 132.

The remaining two non-voting COST members are "the Attorney General, or his or her designee from within the ranks of the Senior Executive Attorney Service" and the Chief Administrative Law Judge ("CALJ") in the OAH.  D.C. Code § 2–1831.07(a).  At the time of plaintiff's reappointment decision, these positions were filled by defendant Nadine Wilburn and defendant Eugene Adams respectively.  Am Compl. ¶¶7–8.

COST appoints ALJs by majority vote after engaging in an application and interview process with prospective candidates.  D.C. Code § 2–1831.08(b); D.C. Mun. Regs. tit. 6B § 3701.1 *et seq.*  Initial terms last for two years, after which an ALJ may be reappointed to a ten-year term, and then a subsequent six-year term.  *See* D.C. Code § 2–1831.08(c)(1).  An ALJ seeking reappointment must file a statement with COST and the CALJ requesting reappointment within the last nine months of the ALJ's term.  D.C. Mun. Regs. tit. 6B § 3705.1.  As soon as practical thereafter, COST must publish a statement in the District Register that the ALJ is seeking appointment, "soliciting views of litigants, attorneys and members of the public" on reappointment.  *Id.* § 3705.7.  Within 120 days of the ALJ's reappointment request, the CALJ is required to prepare a record for COST's review, which must include the ALJ's performance evaluations, decisions made by the ALJ, data on how the ALJ met "objective performance standards," and a  "recommendation, with a statement of reasons, as to whether the [ALJ] should be reappointed." *Id.* §§ 3705.4, 3705.5.

An ALJ up for reappointment is entitled to receive both the record submitted by the CALJ and any comments COST received.  *Id.* §§ 3705.6, 3705.9.  After receipt of

these materials, the ALJ is entitled to supplement the record before COST and appear

before it "to be heard in person concerning his or her reappointment." *Id.* § 3705.10.

Prior to denying reappointment, COST must first serve a "notice of grounds for

possible denial of reappointment" on the ALJ in question, specifying "the reasons why

[COST] is considering" not reappointing him or her. *Id.* § 3705.17. The ALJ may then

file a written response and has the opportunity "to appear and be heard" at the COST

meeting in which it takes final action on the reappointment request. *Id.* § 3705.19.

COST maintains discretion to "permit other persons to testify at the meeting, either in

support of, or in opposition to, the request for reappointment." *Id.*

In making the final reappointment decision, COST must "consider all the

information" it received regarding the reappointment and give "significant weight" to the

CALJ's recommendation, unless COST determines the recommendation is not founded

on substantial evidence. *Id.* § 3705.21. Although COST retains discretion in making

reappointment decisions, *see* D.C. Code § 2–1831.06(b), District regulations state that

"[COST] shall reappoint the [ALJ] if [COST] finds that the [ALJ] has satisfactorily

performed the responsibilities of his or her office and is likely to continue to do so." D.C.

Mun. Regs. tit. 6B § 3705.21.

### A.  Plaintiff's Tenure as an ALJ

Plaintiff was first appointed to serve as an ALJ on OAH in 2005. Am. Compl. ¶ 5.

His initial term expired in 2007, and he was reappointed to a ten-year term set to expire

on June 20, 2017. *Id.* ¶ 37. During his second term, plaintiff was involved in several

controversies at OAH, which he alleges contributed to defendants' improper motivation

for denying him reappointment.  Am. Compl. ¶¶ 59, 179–83.

First, in 2012, plaintiff joined fifteen other ALJs in signing a letter asking a D.C.

Council member and the Mayor to investigate then-CALJ Mary Walker for unethical

behavior.[2]  *Id.* ¶ 46.  According to the Amended Complaint, this "created a rift within

OAH" between those who signed the ALJ letter, including plaintiff, and those who did

not.  *Id.* ¶ 50.  Plaintiff alleges he drew special ire from those aligned with Walker

because of his perceived leadership in her ouster.  *Id.*

Next, also in 2012, plaintiff became ensnared in a controversy regarding ALJ

unionization.  *Id.* ¶ 51.  Plaintiff alleges he led ALJ efforts to unionize, which Walker and

her supporters opposed.  *Id.*  Ultimately, plaintiff's cohort prevailed, and the D.C. Public

Employee Relations Board ("PERB") recognized the OAH ALJs as a local union

bargaining unit—the Federation of Administrative Law Judges ("FALJ" or "Union").  *Id.*

¶¶ 51, 60.  Plaintiff took over as president of the Union, *id.* ¶ 60, and alleges that this

"union leadership intensified the animus against him from Walker supporters."  *Id.* ¶ 52.

Finally, in 2014, plaintiff was involved in a workplace dispute involving ALJ

Yahner—a Walker supporter and anti-Union ALJ.  *Id.* ¶ 53–54.  The Amended

Complaint alleges Yahner "physically confronted" then-CALJ Tucker, who subsequently

issued Yahner a nine-day suspension.  *Id.* ¶ 50.  The suspension was ultimately

overturned by defendant Williams in her role as COST Chair.  *Id.* ¶ 56.  Yahner

circulated the decision overturning the suspension to all ALJs, including plaintiff, and

---

[2] Walker eventually admitted ethical violations, was fined $20,000 for these infractions, and was fired for cause. Am. Compl. ¶ 49.

plaintiff responded to all ALJs stating that defendant Williams's decision did not vindicate Yahner and that Yahner's "behavior, and the COST's validation of it, is another example of the coarsening of American civil society." *Id.* ¶ 57.

## B. Plaintiff's Reappointment Application

In December 2016, plaintiff sought reappointment to a third term. *Id.* ¶ 60. He submitted documents to COST "that evidenced his good performance, including significant decisions, positive evaluations, efficient docket management, committee work, and many other contributions to agency operations and the community." *Id.* ¶ 61.

Around the same time, defendant Adams announced the creation of a new Principal ALJ ("PALJ") position and stated that ALJ Yahner would be appointed to the role. *Id.* This decision violated the Union's collective bargaining agreement ("CBA") with OAH because under the CBA, the creation of a new PALJ position required prior notice and consultation with the Union. Plaintiff, as FALJ president, advised defendant Adams of the infraction and met with defendant Adams and OAH General Counsel Vanessa Natale[3] to discuss Yahner's premature appointment. *Id.* ¶¶ 63–64. The following day, defendant Adams announced over email that he was "gently and professionally" reminded of the terms of the CBA and admitted he had not complied with them. *Id.* ¶ 65. Union–agency discussions over the propriety of the new PALJ position continued for the next few months, overlapping with plaintiff's consideration for reappointment.

---

[3] Natale is not a defendant in this action.

In January 2017, plaintiff alleges defendants began attacking his candidacy for reappointment. *Id.* ¶ 66. He claims that written reminders about the public comment period for his reappointment were "left on the office chairs of only those who resented [plaintiff] for his role in Walker's ouster and his union efforts." *Id.* According to plaintiff, defendants and Natale "encouraged these disaffected employees to submit anonymous letters" opposing his reappointment. *Id.* ¶ 67. Ultimately, COST received 18 letters in support of plaintiff and 6 letters opposing his reappointment, 5 of which were submitted anonymously. *Id.* ¶¶ 71–73.

According to the Amended Complaint, Natale walked unannounced into plaintiff's office on or around March 22, 2017 to discuss his reappointment, which she said was "in peril." *Id.* ¶ 75. Natale reported that "she had regular conversations with defendant Williams and that she could use these back channels to support [plaintiff's] reappointment." *Id.* ¶ 76. She also said she could "use her considerable sway with [defendant] Adams to keep [plaintiff's] reappointment 'out of peril.'" *Id.* But this offer "was subject to a *quid pro quo*"—plaintiff had to "back off of FALJ's objection to the new PALJ position for ALJ Yahner." *Id.* ¶ 77–78 (alleging that Natale "pressed that, if [plaintiff] wanted his job, 'it was best' if FALJ 'fell in line'").

On April 5, 2017, Natale sent an email to plaintiff requesting his views as FALJ president on the new PALJ position. *Id.* ¶ 80. Plaintiff alleges that he declined the *quid pro quo* offer and refused to back down in his Union-related opposition to the new PALJ position. *Id.*

## C. The Investigation

A week later, on April 12, defendant Adams, as CALJ, was required to submit a recommendation to COST regarding plaintiff's reappointment. *See* D.C. Mun. Regs. tit. 6B § 3705.5. Instead, defendant Adams sent a letter to COST stating that he was "postpon[ing] a formal recommendation," in order to complete an "ongoing inquiry" into "matters (of which [plaintiff] is fully aware)." Am. Compl. ¶ 86. Plaintiff alleges no such inquiry was ongoing, and that "[a]fter [plaintiff] refused to back off [his position on the new PALJ], Defendant Adams invoked the [anonymous] letters to launch an investigation." *Id.* ¶ 88.

The investigation ran from May 3 to June 5, 2017, encompassing interviews with three named witnesses and eleven anonymous individuals. *See id.* ¶¶ 92–93. Plaintiff alleges numerous shortcomings in the investigation, including that the investigator was not neutral, that it was controlled by defendant Adams, that the investigation "disregarded all favorable information" and witnesses, that the investigator failed to generate an impartial report, and that the investigation wrongly relied and credited anonymous sources. *Id.* ¶ 89–91.

After the investigation concluded, defendant Adams notified plaintiff that he opposed his reappointment. *Id.* ¶ 96. On June 20, defendant Adams issued his formal negative reappointment recommendation—a 38-page letter with 44 supporting exhibits. *Id.* ¶ 97. The Amended Complaint alleges that in this letter, defendant Adams never challenges plaintiff's performance as an ALJ nor argues that plaintiff failed to satisfy the requirements of his office or that he was otherwise unsuitable for reappointment under

the Establishment Act. *Id.* ¶ 102.  However, defendant Adams's letter discusses numerous instances of "hostile," "abrasive," and "harassing" conduct and concludes that plaintiff's "continued tenure as an ALJ will seriously affect the office's ability to advance and move beyond the discord, antagonism and division that hold it back today." [4]  Ex. 2 to Defs.' Mot. at 38.

### D.  COST's Reappointment Decision

On June 27, defendant Williams served plaintiff a notice of possible grounds for denial of reappointment, which referenced the issues raised in defendant Adams's letter and set a hearing for July 15, 2017. Am. Compl. ¶¶ 107, 110.  On June 29, plaintiff alleges COST convened a "secret" meeting outside of his presence, without his knowledge, and before he had a chance to oppose defendant Adams's negative recommendation. *Id.* ¶¶ 121–22.  Plaintiff alleges that he was excluded even though all COST members as well as Natale and another attorney in OAH General Counsel's office attended. *Id.* ¶ 120.  According to the Amended Complaint, COST deliberated and decided to terminate plaintiff in this meeting. *Id.* ¶¶ 121–22.  Among other things, plaintiff claims that in this meeting (i) defendant Williams relayed negative views regarding plaintiff she had received from her ALJ acquaintances; (ii) defendant Onek suggested that, regardless of [plaintiff's] evidence, "[COST] could simply say that we

---

[4] The letter recounts in detail how plaintiff's "efforts and actions" at OAH were "misguided, harmful and problematic for the agency." Ex. 2 to Defs.' Mot. at 5.  Among other things, it describes allegations that plaintiff engaged in intimidating and harassing behavior towards an OAH attorney-advisor, discriminated amongst individuals in making recommendations for promotion and advancement, and wrote demeaning correspondence to colleagues and subordinates. *See id.* at 7–25.  Defendant Adams concludes these "repeated patterns" of behavior were "too disruptive, too problematic and too enduring to be meaningfully addressed with [plaintiff's] continued presence" at OAH. *Id.* at 28.

find no substantial evidence to counter . . . [defendant Adam's] recommendation;" (iii) Natale stated that she procured a "legal opinion" stating that plaintiff's behavior constituted a hostile work environment; and (iv) defendant Williams stated that "there really is no standard [for reappointment] . . . we review the documents and then we can make the decision." *Id.* ¶ 123.

On July 19, COST then held the first formal meeting on plaintiff's reappointment application. *Id.* ¶ 127. At this meeting, plaintiff was represented by counsel, presented testimony, and argued on his own behalf. *Id.* ¶ 140. He was not permitted, however, to call witnesses or cross-examine those presented by COST. *Id.* ¶ 137. At some point during the hearing, plaintiff and his counsel were ordered to exit the room, while COST met in private. *Id.* ¶ 133. Plaintiff alleges that defendant Hawkins was not present for part of this meeting as he "took phone calls in another room." *Id.* ¶ 138. Plaintiff also alleges COST allowed Natale and other "OAH prosecutors" to engage in its deliberations at or after this meeting. *Id.* ¶ 142.

On September 29, 2017, COST held a final formal meeting, hearing further argument on plaintiff's reappointment. *Id.* ¶¶ 153–55. Shortly after the meeting concluded, COST announced plaintiff's non-reappointment and sent plaintiff a two-page letter explaining the decision. *Id.* ¶ 157–59.[5] The letter states that "having reviewed the entire record, including supplemental submissions by [plaintiff], the CALJ and others, as well as information relayed by all parties, directly or indirectly, at the July 19, 2017

---

[5] Plaintiff alleges this letter was a post-dated version of a letter already signed by defendant on July 21, 2017. *Id.* ¶¶ 143–46, 159.

COST meeting," COST agreed with defendant Adams's recommendation not to reappoint plaintiff. Ex. 8 to Defs.' Mot. at 1. COST concluded that plaintiff "engaged in behaviors that are inconsistent with [his] responsibilities as an ALJ," including "act[ing] inappropriately, unfairly, and, possibly, illegally in [his] interactions with [his] colleagues and other staff" on multiple occasions, which created "fear, tension and a feeling of intimidation in OAH." *Id.* at 1–2.

### E. The PERB Administrative Action

On July 6, 2017, in the midst of plaintiff's consideration for reappointment, the ALJ union—FALJ—filed an administrative complaint against OAH making two claims closely related to the allegations in this suit. First, FALJ asserted that Natale's conduct during the March 22 meeting constituted an "unfair labor practice[]" on behalf of OAH. Ex. 3 to Defs.' Mot. at 3. On this claim, the hearing officer found in favor of the Union, concluding that Natale's statements "directly interfered with and coerced [plaintiff] in the exercise of [his] rights." *Id.* at 3–4.

Second, FALJ claimed that OAH "discriminated regarding tenure or terms and conditions of employment against [plaintiff] to discourage membership in a labor organization." *Id.* at 3. This claim was based on the theory that defendant Adams refused to support plaintiff's reappointment "because the Union refused to withdraw its opposition to the creation of the new PALJ position and the appointment of Judge Yahner." *Id.* at 4. The hearing officer rejected this theory and found no discrimination occurred. *Id.* Specifically, the hearing officer "found that the Union did not meet its burden of establishing that antiunion sentiment was a substantial or motivating factor in

[defendant] Adams' decision not to recommend [plaintiff's] reappointment." *Id.* Critical to this finding was the fact that "Adams was not aware of the March 22, 2017 conversation," as both plaintiff and Natale testified that "neither one of them mentioned this meeting to [defendant] Adams." *Id.* at 3, 5. PERB affirmed the hearing officer on both claims. *Id.* at 6.

### F. Procedural History

After an unsuccessful attempt to reopen the PERB proceeding in 2019, *see id.*, plaintiff filed this action on May 19, 2020. Compl. [Dkt. #1]. He then filed an Amended Complaint on June 30, 2020. Am. Compl. On August 3, 2020, defendants moved to dismiss for failure to state a claim under Rule 12(b)(6). Defs.' Mot. at 1–2.

## STANDARD OF REVIEW

Dismissal under Rule 12(b)(6) is appropriate where a party has failed to set forth "a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive, a complaint must contain sufficient factual allegations that, if accepted as true, state a claim to relief that "is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 552 (2007). In analyzing a motion to dismiss under Rule 12(b)(6), the Court accepts the factual allegations in the complaint as true and draws all reasonable inferences in plaintiff's favor. *Nat'l Postal Prof'l Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 27 (D.D.C. 2006). But plaintiff must offer "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The Court is not bound to adopt "inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Comms. Corp., Inc.*, 16

F.3d 1271, 1276 (D.C. Cir. 1994).

In determining whether a complaint sufficiently alleges a claim, the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Among those documents of which the Court may take judicial notice are public records from other proceedings. *See Abhe & Svoboda, Inc.*, 508 F.3d at 1059 (citing *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005)).

## ANALYSIS

Plaintiff brings this suit under 42 U.S.C. § 1983. Am. Compl. ¶ 1. Because this statute "is not itself a source of substantive rights," *Albright v. Oliver*, 510 U.S. 266, 271 (1994), to state a claim, plaintiff must identify other specific rights that were allegedly infringed. *Id.* Here, he identifies his right to procedural due process under the Fifth Amendment and his right to freedom of association under the First Amendment. Am. Compl. ¶ 1.

### A. Fifth Amendment Due Process Claim

The Fifth Amendment guarantees that "no person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The first step in any due process analysis is assessing whether the plaintiff has identified a constitutionally protected interest. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014). If a plaintiff can show a valid protected interest, the Court must then

asses "whether the procedures used by the Government in effecting the deprivation comport with due process." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).

Plaintiff contends he possessed a constitutionally protected property interest in reappointment as an ALJ.  Pl.'s Opp. to Def.'s Mot. to Dismiss ("Pl.'s Opp.") [Dkt. #28] at 7.  I agree.  Constitutionally protected property interests "stem from an independent source such as state law." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  To have such an interest, an individual "must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Id.*

Under D.C. law, COST's discretion to deny an ALJ reappointment is cabined by regulations stating that "[t]he [COST] *shall* reappoint the [ALJ] if it finds that the [ALJ] has satisfactorily performed the responsibilities of his or her office and is likely to continue to do so." D.C. Mun. Regs. tit. 6B § 3705.21 (emphasis added).  The mandatory language in this provision establishes a sufficient expectation of continued employment to require some process prior to the denial of reappointment. *See Pearson v. District of Columbia*, 644 F. Supp. 2d 23, 47 (D.D.C. 2009), *aff'd* 377 Fed. App'x 34 (D.C. Cir. 2010); *Halleck v. Berliner*, 427 F. Supp. 1225, 1235 (D.D.C. 1977).

The question then becomes whether plaintiff received the process he was due.  The Fifth Amendment's due process requirement "is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).  The guideposts for this inquiry are generally whether the Government provided "notice and opportunity for hearing appropriate to the nature of the case." *Jones v. Flowers*, 547 U.S. 220, 223 (2006).  When a public employee is deprived of a property

interest in further employment, the Supreme Court has held that they are "entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" prior to his termination. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).  In the context of ALJ reappointment, other courts in this district have found that ALJs are *not* entitled to the "full panoply of due process" but have the right to a "thorough and fair evaluation of [their] candidacy by an impartial [COST] . . . and such process as would insure that the [COST's] evaluation of [their] candidacy for reappointment was thorough and fair." *Pearson*, 644 F. Supp. 2d at 47.

Plaintiff argues the process he received was inadequate, citing (1) shortcomings in the notice provided; (2) the lack of an opportunity to confront and cross-examine witnesses; (3) the bias of COST members; (4) the fact that COST allegedly relied on "evidence not adduced at the hearing, including *ex parte* contacts;" (5) defects in COST members' appointments; (6) COST's failure to follow D.C. regulations; and (7) the fact that "the tribunal . . . had already sealed his fate" by the time he had an opportunity to be heard. *See* Pl.'s Opp. at 15–30.  Defendants counter that plaintiff received constitutionally adequate process because he "had ample opportunity to affirmatively present his case after being notified of the possible grounds for non-reappointment." Defs.' Mot. at 21.  Unfortunately for plaintiff, I agree with defendants that the process afforded him comports with constitutional requirements.  How so?

First, plaintiff was adequately put on notice of COST's concerns with sufficient time to address them.  Not only was plaintiff aware of the letters opposing his

reappointment and the investigation regarding his conduct as of April 12, *see* Ex. 3 to

Def.'s Mot. at 3, but on June 21—almost a full month before the first formal hearing on

his reappointment—plaintiff received defendant Adams's detailed letter outlining the

agency's concerns.[6]  Am. Compl. ¶ 106.  By June 26, at the latest, plaintiff had engaged

counsel.  *Id.* ¶ 112.  And COST confirmed on June 27 that the allegations in defendant

Adams's letter served as the basis for plaintiff's possible non-reappointment.  Ex. 5 to

Defs.' Mot. at 1.  This gave plaintiff ample opportunity to understand the allegations

against him and prepare a case with the assistance of counsel before the first formal

hearing on his reappointment.  *See Vanover v. Hantman*, 77 F. Supp. 2d 91,104–05

(D.D.C. 1999).

Next, plaintiff had an adequate opportunity to be heard and air his case.  From

December 2016 through September 2017, plaintiff made an initial submission in support

of his reappointment, met with defendant Adams regarding concerns raised about his

conduct, supplemented the record before COST with additional documents supporting his

case,[7] and communicated numerous times with defendants through counsel regarding his

reappointment.  *See* Am. Compl. ¶¶ 61, 112–14; Ex. 3 to Def.'s Mot. at 3; Ex. 5 to Defs.'

---

[6] Indeed, plaintiff was already on notice of defendant Adams's intention to oppose reappointment as of June 5, 2017.  Am. Compl. ¶ 96.

[7] Plaintiff alleges that COST's notice of possible grounds for denial of reappointment was deficient under D.C. Mun. Regs. tit. 6B § 3705.15 in part because, he argues, it "came before [plaintiff] had the right to supplement the record."  Pl.'s Opp. at 4; *see also* Am. Compl. ¶¶ 107–09.  But plaintiff does not directly deny the fact he had the opportunity to, and did, supplement the record on May 15, 2017.  *See generally* Pl.'s Opp.  In any event, the Court concludes that plaintiff was afforded due process even to the extent he did not have an opportunity to supplement the record before receiving the COST's notice because that document makes it clear that plaintiff had the opportunity to supplement the record before the hearing on his reappointment.  *See* Ex. 5 to Defs.' Mot. at 1–2 (permitting plaintiff to submit a "written response" prior to the hearing on his reappointment).

Mot. at 1.  He also appeared before COST two times, presented argument in his defense, and was permitted to have others—including his counsel and a sitting D.C. Council member—advocate on his behalf.  Am. Compl. ¶ 140, 156.   This "evaluation process adequately safeguarded plaintiff from arbitrary governmental action."  *Halleck*, 427 F. Supp. at 1237; *see also Pearson*, 644 F. Supp. 2d at 48 (holding no due process violation occurred where ALJ "was afforded multiple opportunities to submit evidence on his behalf, to call witnesses, to respond to the [COST's] inquiries and concerns, to present argument supporting his candidacy for reappointment, and to meet with the [COST] regarding his reappointment"), *aff'd* 377 Fed. App'x 34 (D.C. Cir. 2010) ("Pearson's procedural due process claim fails because he was afforded adequate process.").

None of plaintiff's specific grievances undermines this conclusion.  Plaintiff relies heavily on the fact that he was denied the ability to cross-examine witnesses.  Pl.'s Opp. at 19–20 (claiming that due process "necessitated the ability to cross-examine witnesses").  But in the context of ALJ reappointment decisions, due process does not require the confrontation of adverse witnesses.  *Pearson*, 644 F. Supp. 2d at 47–48 ("[T]he [COST's] decision not to allow plaintiff to confront witnesses cannot serve as the basis for plaintiff's due process claim.").  Nor does COST's alleged failure to strictly abide by local regulations constitute a constitutional deprivation.  *AFGE, AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341, 353 (D.C. Cir. 2007) (holding a "mere violation of law does not give rise to a due process claim"); *Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 648–49 (D.C. Cir. 1987) (holding no due process occurred as a result of agency's failure to comply with D.C. regulations).  Nor are plaintiff's conclusory allegations of

bias and reliance on "ex parte contacts," Am. Compl. ¶¶ 123, 128–29, 169, sufficient to render the process deficient. *See Pearson*, 644 F. Supp. 2d at 49 (rejecting conclusory allegations as insufficient to state a due process claim). Nothing in the record suggests COST was impartial or based its decision on any inappropriate considerations. *Kowal*, 16 F.3d at 1276 ("[T]he court need not accept inferences drawn by plaintiff[] if such inferences are unsupported by the facts set out in the complaint.").

Plaintiff also attacks the validity of COST members' appointments. *See* Am. Compl. ¶¶ 10, 132. Focusing on defendants Williams and Onek, plaintiff argues that alleged deficiencies in their appointments render COST's decision invalid. Pl.'s Opp. at 22. But this collateral attack fails under the de facto officer doctrine, which "applies in the context of technical defects and confers validity upon acts performed by a person acting under color of official title, even if it is later determined that the title is deficient." *Wrenn v. District of Columbia*, 808 F.3d 81, 84 (D.C. Cir. 2015); *see also Grooms v. LaVale Zoning Bd.*, 27 Md. App. 266, 274 (Md. App. Ct. 1975) (holding de facto officers may include those that hold "color of official title" due to holding over in office after their official term has ended).

The de facto officer doctrine has "seen substantial contraction over time." *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 35 (D.D.C. 2020). But the parties agree that under "governing D.C. Circuit law," collateral attacks on an official's authority are only permitted where (1) the plaintiff brings his action "at or about the time that the challenged government action is taken" and (2) the plaintiff shows that the agency has had reasonable notice of the claimed defects in the officials' titles. *Id.* (quoting *Andrade*

*v. Lauer*, 729 F.2d 1475, 1499 (D.C. Cir. 1984)); *see also* Pl.'s Opp. at 23.  Here, plaintiff

did not file suit until May 19, 2020—almost three years after COST considered his

reappointment.  Accordingly, he fails to meet the first prong of the test and cannot avoid

the preclusive effect of the de facto officer doctrine. *Andrade*, 729 F.2d at 1499

("Prohibiting attacks on government actions taken long before suit was filed protects

those who have relied on those actions and avoids the chaos that might ensure if all the

actions taken by an official improperly in office for years were subject to invalidation.").

Finally, plaintiff contends that his hearings on July 19 and September 29 were

sham hearings designed to legitimize COST's decision, which, he alleges, was finalized

by the "secret *ultra vires* group" involved in the June 29 meeting. Am. Compl. ¶¶ 118–

26.  But plaintiff offers nothing more than conclusory statements in support of this

theory, which are insufficient to survive a motion to dismiss. *Twombly*, 550 U.S. at 556

(holding the standard under Rule 12(b)(6) "calls for enough fact to raise a reasonable

expectation that discovery will reveal evidence" of a valid claim).  Despite quoting with

specificity what was said during the June 29 meeting, *see* Am. Compl. ¶ 123, the

Amended Complaint presents no factual allegations supporting the conclusion that COST

prematurely decided to not reappoint plaintiff at this time. *See JSC Transmasholding v.

Miller*, 70 Supp. 3d 516, 520 (D.D.C. 2014) ("[R]aising a 'sheer possibility that a

defendant has acted unlawfully' fails to satisfy the facial plausibility requirement.'"

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To the contrary, the allegations in

the Amended Complaint permit only the inference that COST deliberated regarding

plaintiff's reappointment in the June 29 meeting and considered the possibility of not

19

reappointing him—neither of which runs afoul of due process.[8]  *See Pearson*, 644 F.

Supp. 2d at 46–48.  Accordingly, plaintiff fails to adequately state a Fifth Amendment

procedural due process claim.

### B. First Amendment Retaliation Claim

To state a First Amendment retaliation claim, plaintiff must (1) show that his

protected activity related to a matter of public concern;[9] (2) show that his interest in

engaging in protected activity outweighs the state's interest as an employer; (3) show that

his activity was a substantial or motivating factor in his discharge; and (4) rebut the

Government's showing, if any, that it would not have reached the same decision absent

the protected conduct.  *See Hall v. Ford*, 856 F.2d 255, 258 (D.C. Cir. 1988).  The first

two elements are questions of law for the court to resolve, while the latter two are

questions of fact "ordinarily left to the jury."  *Id.*

Plaintiff asserts that he engaged in protected activity through his Union

membership and "by taking action in support of union interests."  Am. Compl. ¶179; Pl.'s

Opp. at 36–37.  In his view, this activity "served as a substantial factor in the [COST's]

non-reappointment decision."  Pl.'s Opp. at 37.  Defendants reject this conclusion,

asserting that plaintiff does not "allege any facts showing that his union membership or

---

[8]  Plaintiff also alleges that the September 29, 2017 letter was "a post-dated version" of the non-reappointment letter defendant Williams had already signed on July 21, 2017.  Am. Compl. ¶ 159. Even to the extent this is true and COST had already decided, as of July 21, 2017, to not reappoint plaintiff, the Court finds that COST provided constitutionally adequate due process.  Under this theory, plaintiff would still have been afforded adequate notice and an opportunity to be heard at the July 19 meeting.  *See Mathews*, 424 U.S. at 333 (requiring only notice and an opportunity to be heard "at a meaningful time and in a meaningful manner").

[9]  Our Circuit has yet to decide whether the first element regarding public concern applies where, as here, claims are premised on associational rights as opposed to speech.

union organization activity was a substantial or motivating factor in his non-reappointment." Def.'s Mot. at 39.  In any event, defendants argue, plaintiff "is collaterally estopped from relitigating this issue, having already lost after a full and fair hearing before PERB." *Id.* n.11.  I agree with defendants that issue preclusion prevents plaintiff from asserting that his union activities were a substantial and motivating factor in COST's decision, and therefore precludes him from stating a valid First Amendment retaliation claim.  How so?

Issue preclusion occurs where "(1) the issue was actually litigated; (2) was determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the party; and (4) under circumstances where the determination was essential to the judgment." *DeWitt v. District of Columbia*, 43 A.3d 291, 300 (D.C. 2012); *see also Brewer v. District of Columbia*, 105 F. Supp. 3d 74 (D.D.C. 2015). Administrative proceedings may give rise to issue preclusion just as cases litigated in the courts. *See B&B Hardware, Inc. v. Hargis Industries, Inc.*, 575 U.S. 138, 148 (2015) ("[W]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata.").

Here, the PERB proceeding prevents relitigating the issue of whether "antiunion sentiment was a substantial or motivating factor in [defendant] Adams's decision not to recommend [plaintiff's] reappointment." Ex. 3 to Defs.' Mot. at 4.  That issue was squarely before the administrative hearing officer and the PERB and was conclusively decided in defendants' favor. *Id.* at 7.

21

Plaintiff does not argue the PERB proceeding was inadequate in any way that would undermine the application of issue preclusion. *See* Pl.'s Opp. at 39–40.  Instead, he asserts the third element of issue preclusion is not met because the Union was the party before PERB, not plaintiff, and therefore its determination cannot bind him, a nonparty. *Id.*  Many courts, however, have found litigation conducted by unions as binding on their members for preclusion purposes. *See, e.g.*, *Brewer*, 105 F. Supp. 3d at 90 (collecting cases).

Plaintiff also asserts, without any support, that issue preclusion is inappropriate because "the controlling law differs" between the PERB litigation and the present case. Pl.'s Opp. at 40.  But this argument fares no better.  It is not the precise pleading of legal claims that matters for purposes of issue preclusion, but "whether the parties in the subsequent case have posed a significant issue of fact that was already asked, considered, and answered by a court of competent jurisdiction in a previous lawsuit." *Brewer*, 105 F. Supp. 3d at 89.  Accordingly, I will apply issue preclusion to prevent plaintiff from challenging the fact that anti-union sentiment was not a substantial or motivating factor in defendant Adams's decision not to recommend plaintiff for reappointment.

The question remains, however, whether plaintiff has nonetheless stated a valid First Amendment retaliation claim against Adams or any other defendant.  I find he has not.  Excluding the allegations relating to defendant Adams's investigation and the resulting negative recommendation, the Amended Complaint contains only threadbare allegations relating to any of the other defendants' motivations.  Indeed, it is evident from the Amended Complaint that defendant Adams's alleged anti-union motivations are the

lynchpin of plaintiff's First Amendment claim. Am. Compl. ¶ 183 ("Many of the claims in Adams's [negative recommendation] letter have their basis in [plaintiff's] union activities, including activities in which [plaintiff] engaged in as part of his duties as union chapter president. Defendants would not and could not have come to the same decision not to reappoint without [plaintiff's] union activities having played such a large role in Adams's justifications."). Thus, without the allegations relating to defendant Adams's recommendation, plaintiff fails to plausibly allege that anti-union sentiment was a substantial or motivating factor with respect to any defendant's conduct.[10] Accordingly, plaintiff fails to adequately state a First Amendment retaliation claim.

### C. Municipal Liability

Plaintiff also fails to allege any basis for municipal liability. To state a claim against the District, plaintiff must show that a constitutional violation resulted from: (1) "the explicit setting of a policy by the government that violates the Constitution;" (2) "the action of a policy maker with the government;" (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become custom;" or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show deliberate indifference." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

Plaintiff argues that the Amended Complaint supports a theory of liability based on custom, deliberate indifference, or the actions of a policy maker. *See* Pl.'s Opp. at 43–

---

[10]   This conclusion is reinforced by the fact that COST was required to give "significant weight" to defendant Adams's negative recommendation unless COST determined the recommendation was not founded on substantial evidence. D.C. Mun. Regs. tit. 6B § 3705.21.

44.  I disagree.

Plaintiff alleges no policy, or custom, of denying reappointment to union-affiliated ALJs or depriving those ALJs of due process.  *See Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013) (noting the "high hurdle" required to plead a custom-based theory of municipal liability).  Indeed, the Amended Complaint does not reference any other reappointment decisions, except in the most ancillary terms.  *See* Compl. ¶ 128 (alleging ex parte communications occurred in "another ALJ reappointment").  As such, plaintiff fails to state a custom-based claim against the District.

Nor can plaintiff's Amended Complaint support a policy-maker or deliberate indifference theory.  COST is not a policy maker, s*ee Singletary v. District of Columbia*, 766 F.3d 66, 74 (D.C. Cir. 2014) (holding the Parole Board was not a policy maker for purposes of establishing parole policy), and the Amended Complaint fails to articulate an alleged need, or the District's failure to respond appropriately, as is required to establish deliberate indifference.  Accordingly, the Court dismisses plaintiff's claims against the District for the independent reason that the Amended Complaint fails to adequately state a municipal liability claim.

### D.  Qualified Immunity

Finally, the individual defendants are entitled to qualified immunity to the extent plaintiff sues them in their individual capacities.  "[W]hen a plaintiff sues a government agent in his/her individual capacity and the defenses of absolute and qualified immunity are raised, that plaintiff must overcome those defenses in order to survive a Rule 12(b)(6) motion to dismiss."  *Jackson v. Bush*, 448 F. Supp. 2d 198, 200 (D.D.C. 2006).  Under

the doctrine of qualified immunity, officials performing discretionary functions[11]

"generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Pearson*, 644 F. Supp. 2d at 36 (quoting *Hawlow v. Fitzgerald*, 457

U.S. 800, 818 (1982)).

For the reasons stated above, the Court has already found that plaintiff fails to

state a constitutional violation. But even assuming plaintiff adequately pleaded a Fifth or

First Amendment violation, the Court finds that the same reasons support granting the

individual defendants qualified immunity. Simply put, plaintiff's allegedly infringed

rights were not "clearly established" at the time COST made its decision. *Ashcroft v. al-*

*Kidd*, 563 U.S. 731, 735 (2011) (instructing courts "not to define clearly established law

at a high level of generality"). To the contrary, based on the relevant available caselaw, a

reasonable official in defendants' situation could have believed that his or her conduct

did not violate plaintiff's constitutional rights. *See Pearson*, 644 F. Supp. 2d at 36

(holding COST members entitled to qualified immunity on allegations of First and Fifth

Amendment violations). Accordingly, the individual defendants are entitled to qualified

immunity and the claims against them are dismissed for this independent reason.[12]

---

[11] COST members are undeniably performing a discretionary function in deciding whether to reappoint an ALJ. *Pearson*, 644 F. Supp. 2d at 35.

[12] The Court also recognizes that COST members receive no salary for their service. D.C. Code § 2–1831.07(e). Were the Court not to apply the principles of qualified immunity at this early stage in the proceedings, the specter of personal liability may significantly reduce the Government's ability to fill those positions with qualified individuals. *See Mitchell v. Forsyth*, 472 U.S. 511 (1985) (noting officials entitled to qualified immunity enjoy "immunity from suit rather than a mere defense to liability," which will be "effectively lost if a case is erroneously permitted to go to trial").

## CONCLUSION

For all of the foregoing reasons, the Court GRANTS defendants' motion to dismiss and DISMISSES the action in its entirety.  An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge